## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| **THORNE RESEARCH, INC.**, a South Carolina corporation, | Case No.  2:24-cv-02356-DCN |
| Plaintiff, | **COMPLAINT FOR DAMAGES, INJUNCTIVE, AND OTHER RELIEF FOR VIOLATION OF 15 U.S.C. § 1114; 15 U.S.C. § 1125(a); 15 U.S.C. § 1125(c); AND RELATED CLAIMS** |
| v. | |
| **REZA DAVACHI**, a natural person, **REZ CANDLES INC.**, a Delaware corporation, **PARVIN DAVACHI**, a natural person, **PBD COLLECTIBLES LLC**, a Maryland limited liability company, and **JOHN DOES 1-10**, individually or as corporations/business entities, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiff Thorne Research, Inc. ("Thorne" or "Plaintiff") brings this action against Defendants Reza Davachi, Rez Candles Inc., Parvin Davachi, PBD Collectibles LLC, and John Does 1-10 (collectively, "Defendants") for: (1) trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114; (2) unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (3) common law trademark infringement; (4) unfair and deceptive trade practices in violation of S.C. Code § 39-5-10 *et seq*.; and (5) tortious interference with contract and business relations.  These claims arise from Defendants' misappropriation of Thorne's trademarks in connection with Defendants' unlawful sale on the Internet of materially different and non-genuine products bearing Thorne's trademarks.  In support of its complaint, Thorne alleges as follows:

## PARTIES

1.    Thorne is a corporation, organized under the laws of South Carolina, with its principal place of business in Summerville, South Carolina.

2.      Reza Davachi ("Reza") is a natural person who, upon information and belief, currently resides at 24125 Preakness Drive, Damascus, Maryland 20872.  Reza operates: (1) an online storefront on.www.amazon.com ("Amazon") that is currently called "River of Human Health" and can be accessed at https://www.amazon.com/sp?seller=A35CSG8GBUTFQU (the "Amazon Storefront"); (2) an online storefront on www.walmart.com ("Walmart") that is currently called "Oasis of Health_BlockChain" and can be accessed at http://www.walmart.com/seller/101007418 (the "Walmart Storefront"); and (3) a website located at https://theoasisofhealth.com/ (the "Private Website"). Reza sells infringing products bearing Thorne's trademarks through the Amazon Storefront, Walmart Storefront, and Private Website, and does business throughout the United States through the Amazon Storefront, Walmart Storefront, and Private Website including in South Carolina.

3.      Rez Candles Inc. ("Rez Candles") is a corporation formed under the laws of the State of Delaware.  According to corporate documents filed with the State of Maryland, the principal place of business of Rez Candles is located in Clarksburg, Maryland and the registered agent address of Rez Candles is 24125 Preakness Drive, Damascus, Maryland 20872.  Rez Candles sells infringing products bearing Thorne's trademarks through the Amazon Storefront, Walmart Storefront, and Private Website, and does business throughout the United States through the Amazon Storefront, Walmart Storefront, and Private Website including in South Carolina.

4.      Corporate documents that have been filed for Rez Candles with the State of Maryland identify Reza as the resident agent of Rez Candles and do not identify any other individuals as agents or officers of Rez Candles.  Upon information and belief, Reza is the sole corporate officer of Rez Candles and is in control of and primarily responsible for the actions of Rez Candles.

5.      Thorne asserts claims against Reza in his individual capacity and also in his capacity as a corporate officer of Rez Candles.  Upon information and belief, both Reza in his individual capacity and Rez Candles assist in and are responsible for the operation of and sales of products through the Amazon Storefront, Walmart Storfront, and Private Website.

6.      Alternatively, as the sole officer of Rez Candles, Reza directs, controls, ratifies, participates in, or is the moving force behind the acquisition and sale of infringing products bearing Thorne's trademarks by Rez Candles.  Upon information and belief, Reza personally participates in the acquisition and sale of infringing products by Rez Candles.  Accordingly, Reza is personally liable for infringing activities carried out by Rez Candles without regard to piercing the corporate veil.

7.      Alternatively, upon information and belief, Rez Candles follows so few corporate formalities and is so dominated by Reza that it is merely an alter ego of Reza.  Accordingly, Thorne is entitled to pierce the corporate veil of Rez Candles and hold Reza personally liable for the infringing activities of Rez Candles.

8.      Parvin Davachi ("Parvin") is a natural person who, upon information and belief, currently resides at 2923 Bow Line Pl., Longmont, CO, 80503.  Parvin sells infringing products bearing Thorne's trademarks through the Amazon Storefront, Walmart Storefront, and Private Website, and does business throughout the United States through the Amazon Storefront, Walmart Storefront, and Private Website including in South Carolina.

9.      PBD Collectibles LLC ("PBD") is a limited liability company formed under the laws of the State of Delaware.  According to corporate documents filed with the State of Maryland, the principal place of business of PBD is located in Damascus, Maryland and the registered agent address of PBD is 26212-B Ridge Road, Damascus, Maryland 20872.  PBD sells infringing

products bearing Thorne's trademarks through the Amazon Storefront, Walmart Storefront, and Private Website, and does business throughout the United States through the Amazon Storefront, Walmart Storefront, and Private Website including in South Carolina.

10.    Corporate documents that have been filed for PBD with the State of Maryland identify Parvin as the resident agent of PBD and do not identify any other individuals as agents or members of PBD.   Upon information and belief, Parvin is the sole member of PBD and is in control of and primarily responsible for the actions of PBD.

11.    Thorne asserts claims against Parvin in her individual capacity and also in her capacity as the sole member of PBD.  Upon information and belief, both Parvin in her individual capacity and PBD assist in and are responsible for the operation of and sales of products through the Amazon Storefront, Walmart Storefront, and Private Website.

12.    Alternatively, as the sole member of PBD, Parvin directs, controls, ratifies, participates in, or is the moving force behind the acquisition and sale of infringing products bearing Thorne's trademarks by PBD.  Upon information and belief, Parvin personally participates in the acquisition and sale of infringing products by PBD.  Accordingly, Parvin is personally liable for infringing activities carried out by PBD without regard to piercing the corporate veil.

13.    Alternatively, upon information and belief, PBD follows so few corporate formalities and is so dominated by Parvin that it is merely an alter ego of Parvin.  Accordingly, Thorne is entitled to pierce the corporate veil of PBD and hold Parvin personally liable for the infringing activities of PBD.

14.    Thorne believes that other individuals or entities may be responsible for the events and occurrences referred to herein or be otherwise interested in the outcome of the dispute. The true names, involvement, and capacities, whether individual, corporate, associated, or otherwise

of these individuals or entities are unknown to Thorne. Therefore, Thorne sues these defendants by the fictitious names John Does 1 through 10. When the true names, involvement, and capacities of these parties are ascertained, Thorne will seek leave to amend this Complaint accordingly. If Thorne does not identify any such parties, it will dismiss these defendants from this action.

## JURISDICTION AND VENUE

15. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338, and 1367. Thorne's federal claims are predicated on 15 U.S.C. §§ 1114 and 1125(a), and its claims arising under the laws of the State of South Carolina are substantially related to its federal claims such that they form part of the same case or controversy under Article III of the United States Constitution.

16. This Court has personal jurisdiction over Defendants because they have expressly aimed tortious activities toward the State of South Carolina and established sufficient minimum contacts with South Carolina by, among other things, advertising and selling substantial quantities of infringing products bearing Thorne's trademarks to consumers within South Carolina through a highly interactive commercial website, with knowledge that Thorne is located in South Carolina and is harmed in South Carolina as a result of Defendants' sales of infringing products to South Carolina residents. Defendants know that Thorne is located in South Carolina, among other reasons, because they received cease-and-desist letters informing them that Thorne is located in South Carolina and is harmed in South Carolina by their unlawful actions. Thorne's claims arise out of Defendants' substantial and regular sales of infringing products bearing Thorne's trademarks to South Carolina residents.

17.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred within this judicial district and because Defendants are subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS

### Thorne and Its Trademarks

18.     Thorne is a health and technology company focused on combining dietary and lifestyle recommendations with nutritional supplement intervention.  Thorne is one of the industry's leading manufacturers of dietary supplements and at-home biomarker tests.

19.     Thorne allows products sold under the Thorne brand (referenced hereinafter as "Thorne products") to be sold to end-user consumers in the United States only by Thorne itself and by sellers who Thorne has expressly authorized to sell Thorne products ("Authorized Sellers").

20.     Thorne allows Authorized Sellers to sell Thorne products only in approved channels and requires Authorized Sellers to abide by agreements, policies, and other rules that impose requirements relating to quality controls, customer service, and other sales practices (collectively, the "Thorne Rules").

21.     Thorne devotes a significant amount of time, energy, and resources toward protecting the value of its brands, products, name, and reputation.  By distributing Thorne products exclusively through itself and its Authorized Sellers that are required to follow the quality controls and other requirements in the Thorne Rules, Thorne ensures that consumers receive products that are subject to its quality controls and maintains the integrity and reputation of its brands.  In the highly competitive market for supplements, quality and customer service are fundamental parts of the consumer's decision to purchase a product.

22.     To promote and protect its brands, Thorne has acquired rights to trademarks and registered numerous trademarks with the United States Patent and Trademark Office including but

not limited to: THORNE® (U.S. Trademark Reg. No. 5,257,935), MEDICLEAR® (U.S. Trademark Reg. No. 2,525,208), RESVERACEL® (U.S. Trademark Reg. No. 5,218,436), FLORASPORT 20B® (U.S. Trademark Reg. No. 5,277,254), RECOVERYPRO® (U.S. Trademark Reg. No. 5,638,002), ENTEROMEND® (U.S. Trademark Reg. No. 4,837,342), NIACEL® (U.S. Trademark Reg. No. 4,796,156), CATALYTE® (U.S. Trademark Reg. No. 4,392,385), FIBERMEND® (U.S. Trademark Reg. No. 4,410,287), METHYL-GUARD® (U.S. Trademark Reg. No. 2,178,525), S.A.T.® (U.S. Trademark Reg. No. 2,264,778), PHYTOPROFEN® (U.S. Trademark Reg. No. 2,290,249), and CRUCERA® (U.S. Trademark Reg No. 4,167,882) (collectively, the "Thorne Trademarks").

23.    The registration for each of the Thorne Trademarks is valid, subsisting, and in full force and effect.

24.    Further, Thorne's right to use many of the Thorne Trademarks has become incontestable under 15 U.S.C. § 1065 because the trademarks have been in continuous use, Thorne received no final legal decision issued against the trademarks, and Thorne timely filed a Section 15 Declaration describing the trademarks' use. Accordingly, these trademarks serve as conclusive evidence of Thorne's ownership of the marks and of its exclusive right to use and direct the use of the marks in commerce and in connection with the sale and distribution of products bearing the marks identified in the registrations, as provided by 15 U.S.C. § 1115(b).

25.    Thorne actively uses, advertises, and markets all of the Thorne Trademarks in commerce throughout the United States.

26.    Thorne was founded in 1984 and has advertised, promoted, and sold products in interstate commerce under the Thorne name and trademarks since that time. An example of the type of products sold under the Thorne name and trademarks is depicted below:



27.    Consumers and healthcare practitioners recognize Thorne as the name associated with manufacturing comprehensively-tested, high-quality, research-based supplements that are sustainably sourced from pure, premium ingredients.

28.    Thorne is known by consumers and healthcare practitioners for manufacturing supplement products that are "100% clean" – meaning they are free from harmful or unnecessary ingredients, including but not limited to eggs, fructose, sulfites, and TBHQ, among many others on the "Thorne No List."

29.    The Thorne name is recognized by consumers and healthcare practitioners for the quality of Thorne products and the rigorous quality controls and testing Thorne products are subject to.  Specifically, Thorne is known for having invested in two state-of-the-art in-house laboratories where it conducts four rounds of testing for its products, including: (1) testing every raw material and component in state-of-the-art in-house laboratories for contaminants; (2) testing every in-process batch for homogeneity and to confirm consistency; (3) testing every finished product to ensure its identity, potency, and purity have been maintained and that there has been no microbiological contamination during manufacturing; and (4) testing for product stability to confirm that the product will meet the label claim up to the product's time of expiration.

30.    Consumers and healthcare practitioners also associate Thorne with engaging in extensive clinical research to ensure proper formulation and function for its products.  Thorne is only one of a few supplement manufacturers to collaborate with the Mayo Clinic, and Thorne partners with several research organizations, including, but not limited to, the Cleveland Clinic, Columbia University, Emory, Johns Hopkins University, The University of Texas MD Anderson Cancer Center, and the University of South Carolina.

31.    Consumers and healthcare practitioners also are aware that as a result of Thorne's extensive testing processes, research, and quality controls, it is a NSF Certified facility and manufactures more than thirty NSF Certified for Sport® products, and is the proud exclusive nutritional supplemental provider for several U.S. National Teams.

32.    Thorne is also known by consumers and healthcare practitioners for having an exemplary record of compliance with the Current Good Manufacturing Practices (cGMP) set by the U.S. Food and Drug Administration, and is fully certified by Australia's Therapeutic Goods Administration, widely recognized as one of the toughest regulatory agencies in the world.

33.    For all of these reasons, the Thorne Trademarks are widely recognized by the general consuming public of the United States, and Thorne is recognized as the source of products bearing the Thorne Trademarks.

34.    Due to the superior quality and exclusive distribution of Thorne products, and because Thorne is uniquely recognized as the source of these high quality products, the Thorne Trademarks have substantial value.

### Online Marketplaces and the Challenges They Present to Thorne Product Quality and Goodwill

35.    E-commerce retail sales have exploded over the past decade.  From 2009 through the end of 2023, the percentage of total retail sales in the United States that were completed through

e-commerce channels rose from 3.8% to 15.6%. *E-Commerce Retail Sales as a Percent of Total Sales*, Federal Reserve Bank of St. Louis (February 20, 2024), https://fred.stlouisfed.org/series/ECOMPCTSA.

36.    In 2022 consumers spent $1.03 trillion on e-commerce sales, a 7.7% increase from 2021. *See* Paul Conley, *U.S. ecommerce in 2022 tops $1 trillion for first time*, Digital Commerce 360 (February 17, 2023), https://www.digitalcommerce360.com/article/us-ecommerce-sales/. The massive growth in e-commerce is being driven largely by sales on online marketplaces.  For example, in 2021 United States consumers spent more than $378 billion in e-commerce sales on Amazon, which was an 18.8% increase from 2020 and 43.5% of total e-commerce sales in 2021.

37.    While online marketplaces have created a great deal of opportunity, they also greatly challenge a brand owner's ability to control the quality and safety of its products.

38.    Unlike when purchasing products at a brick-and-mortar store, consumers who purchase products through online marketplaces cannot touch, inspect, or interact with products before purchasing them.  Instead, consumers must trust that the product they receive from an online order will be authentic and of the quality they expect and typically receive from the manufacturer.

39.    Online marketplaces have an exceedingly low barrier to entry, do not require sellers to be authorized sellers of the products they sell, and do not require sellers to disclose to consumers whether they are an authorized or unauthorized seller.  As a result, any person who is able to obtain a brand owner's products through unauthorized diversion can sell the products on online marketplaces while concealing that they are an unauthorized seller who is outside of, and does not abide by, the brand owner's quality controls.

40.    Online marketplaces are overrun by unauthorized sellers who have no relationship with (or obligations to) brand owners who exercise quality controls over their products sold by

authorized sellers.  It is unfortunately common for unauthorized sellers to sell diverted products on online marketplaces that are of lesser quality than products sold through brand owners' authorized channels.  *See* Scott Cohn, *Greed Report: Your quest for savings could land you in the "gray market,"* CNBC, Sept. 8, 2016, https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-savings-could-land-you-in-the-gray-market.html; Alexandra Berzon et al., *Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products*, THE WALL STREET JOURNAL, Aug. 23, 2019, https://www.wsj.com/articles/amazon-has-ceded-control-of-its-site-the-result-thousands-of-banned-unsafe-or-mislabeled-products-11566564990.  It is also common for unauthorized sellers to sell products that are previously used—including products retrieved from dumpsters—as "new" on online marketplaces.   *See* Khadeeja Safdar et al., *You Might Be Buying Trash on Amazon—Literally*, THE WALL STREET JOURNAL, Dec. 18, 2019, https://www.wsj.com/articles/you-might-be-buying-trash-on-amazonliterally-11576599910.

41.    The business press has also reported extensively on how there is an "epidemic" of counterfeit products being sold on online marketplaces that diverters are exploiting because they know consumers trust marketplaces and think the products they are buying through the marketplaces are genuine.  *See* Spencer Soper, *Amazon Gets Real About Fakes*, Bloomberg, Nov. 28, 2016, https://www.bloomberg.com/news/articles/2016-11-28/amazon-gets-real-about-fakes; Jay Greene, *How Amazon's quest for more, cheaper products has resulted in a flea markets of fakes*, THE WASHINGTON POST, Nov. 14, 2019, https://www.washingtonpost.com/technology/2019/11/14/how-amazons-quest-more-cheaper-products-has-resulted-flea-market-fakes/?arc404=true.

42.    The problem of sales of counterfeit and other poor-quality products on online marketplaces has become so serious that, in November 2019, the United States Senate Finance

Committee issued a bipartisan report on the issue. The Committee found that the rise of e-commerce has fundamentally changed how consumers shop for products and that, as e-commerce has grown, counterfeit goods and products that "violate a right holder's trademark or copyright" are being sold at an accelerating rate on e-commerce platforms. The Committee concluded that these sales are a "significant threat" to rights holders' brands and to consumers, and that under current law it is up to rights holders to protect their intellectual property rights online. *See* Senate Finance Committee, *The Fight Against Fakes: How Statutory and Regulatory Barriers Prevent the Sharing of Information on Counterfeits*, Nov. 7, 2019, https://www.finance.senate.gov/imo/media/doc/The%20Fight%20Against%20Fakes%20%20(2019-11-07).pdf.

43.     In 2020, the Department of Homeland Security published a report noting that online marketplaces can facilitate the sale of counterfeit goods and that "American consumers shopping on e-commerce platforms and online third-party marketplaces now face a significant risk of purchasing counterfeit or pirated goods." Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods* (Jan. 24, 2020), available at https://www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf, at 7. The report stated that consumers on online marketplaces cannot rely on traditional "red flag" indicators of counterfeits and "have been surprised to discover that upon completion of an online sales transaction, that the order will be fulfilled by an unknown third-party seller." *Id*. at 14-15, 38. To mitigate these problems, the report recommended "[s]ignificantly enhanced vetting of third-party sellers." *Id.* at 35.

44.     In its 2018, 2019, 2020, 2021, and 2022 annual reports to its shareholders, Amazon acknowledged that third party sellers on its marketplace are selling products that are "counterfeit,"

"pirated," "stolen," or otherwise "materially different" from the product that was described to consumers. *See, e.g.,* Amazon.com, Inc., Annual Report (Form 10-K), at 8 (Feb. 2, 2023), *available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0001018724/336d8745-ea82-40a5-9acc-1a89df23d0f3.pdf  Amazon conceded that these actions are "violating the proprietary rights of others" and warned its investors that it could be liable for "unlawful activities" of Amazon third-party sellers.

45.    Because brand owners have no relationship with or control over unauthorized sellers, brand owners have no ability to exercise their quality controls over products sold by unauthorized sellers or to ensure the products are safe and authentic.  A brand owner's inability to exercise control over the quality of its products presents serious risks to the health and safety of consumers—particularly when, as here, a brand owner's products are ingested by consumers.

46.    The structure, construction, and user interface of online marketplaces also pose threats to a brand owner's ability to maintain its goodwill, reputation, and brand integrity.

47.    When purchasing products on an online marketplace, customers are ordinarily not informed whether a seller of a product is authorized by the brand owner.  Additionally, the interface design of many online marketplaces causes consumers to falsely believe that they are always purchasing from the brand owner or, at minimum, from an authorized seller that is selling under the brand owner's oversight and with the brand owner's approval.  Consumers who purchase on Amazon are particularly likely to experience this confusion because, on Amazon, all sellers of a product are listed under a single product listing that states "Brand [name of brand]" immediately under the title of the product even though many products are sold on Amazon by unauthorized sellers that have no relationship with the brand owner.

48.    For all of these reasons, a vast number of consumers purchase products on online marketplaces without recognizing that they purchased from an unauthorized seller that does not (and cannot) follow the brand owner's quality controls.

49.    When a consumer purchases on an online marketplace and receives a product that is damaged, defective, or of otherwise poor quality, the consumer is much more likely to associate the problem with the brand/manufacturer rather than the product seller.

50.    Online marketplaces also give disgruntled customers a powerful and convenient forum to air their grievances about problem products:  online product reviews.  Any consumer who is dissatisfied with a product received can post a review on the marketplace for all other consumers across the world to see.  These reviews, which often remain permanently attached to products, will often criticize the brand rather than the marketplace seller that sold the product.

51.    Online product reviews significantly impact a brand's reputation.  Survey results show that 82% of United States adults "sometimes" consult online reviews for information when they consider buying a new product online, and 40% "always" or "almost always" consult such reviews.  Aaron Smith & Monica Anderson, *Online reviews*, PEW RESEARCH CENTER, Dec. 19, 2016, http://www.pewinternet.org/2016/12/19/online-reviews/.

52.    Studies and surveys consistently show that consumers place extraordinary trust in online product reviews.  For instance, research has shown that 49 % of online consumers now trust online reviews as much as personal recommendations from friends and family.  Jamie Pitman, *Local      Consumer      Review      Survey      2022*,      BRIGHTLOCAL, https://www.brightlocal.com/research/local-consumer-review-survey/.   The mere presence of reviews on an online product page can also increase conversion by up to 270% when compared to product pages that do not display reviews.  Tom Collinger, *How Online Reviews Influence Sales*,

NORTHWESTERN UNIVERSITY, https://spiegel.medill.northwestern.edu/how-online-reviews-influence-sales/.  Because consumers so heavily "rely on reviews when they're shopping online," the Federal Trade Commission has begun suing companies who post fake reviews of their products on online marketplaces.  Megan Henney, FTC cracking down on fake Amazon reviews, FOX BUSINESS, Feb. 28, 2019, https://www.foxbusiness.com/technology/ftc-cracking-down-on-fake-amazon-reviews (quoting a press release from the director of the FTC).

53.    Consumers also pay special attention to negative online reviews of products because negative reviews are generally outnumbered by positive reviews and consumers believe negative reviews are particularly trustworthy due to their scarcity.  *See* Caroline Beaton, *Why You Can't Really Trust Negative Online Reviews*, THE NEW YORK TIMES, June 13, 2018 https://www.nytimes.com/2018/06/13/smarter-living/trust-negative-product-reviews.html.  According to one study, 85% consumers will intentionally seek out negative reviews when shopping online.  Faith Hinz, *The Growing Power of Reviews*, POWERREVIEWS, 2018, https://www.powerreviews.com/wp-content/uploads/2018/03/The-Growing-Power-of-Reviews.pdf.  As a result, brands are especially harmed when consumers leave negative product reviews after purchasing from an unauthorized seller because the reviews will be widely viewed and deemed to be particularly accurate in describing a product's quality.

54.    Negative reviews also hurt a brand's placement in search results on Amazon and other search engines, as Amazon's search algorithm downgrades products it believes consumers are less likely to buy.  Thus, poor reviews can create a downward spiral where downgraded search placement leads to reduced sales, which leads to search placement falling further.  For all of these reasons, negative online reviews can be the death knell for a manufacturer's online product listings.

**Thorne's Reputation and Goodwill Have Been Harmed by Numerous
Online Reviews Written by Consumers Who Purchased
Poor Quality Products from Unauthorized Sellers on Online Marketplaces**

55.     Consumers who purchase from unauthorized sellers on online marketplaces frequently receive poor quality products or customer service and leave negative reviews on product listings.  These negative reviews injure consumer perceptions of a brand's quality and reputation, ultimately causing the brand to suffer damage to its goodwill and lost sales.

56.     Numerous consumers have written negative reviews of Thorne products being offered for sale on online marketplaces.  In these reviews, many of which appear on listings of products that have been offered for sale by Defendants, consumers have given misappropriated Thorne products low "ratings" and complained of receiving products that were damaged, dirty, expired, spoiled, foul-smelling, tampered with, unsealed, previously used, and missing contents.

57.     For example, Defendants have sold on Amazon the Thorne product seen in the screenshot below:



58.     As seen in the following sample screenshots of customer reviews, consumers have left negative reviews of this product complaining of receiving products that were spoiled, rancid, discolored, and unsealed:









59.    Below is a screenshot of another Thorne product that Defendants have sold on Amazon:



60.    As seen in the following sample screenshots of customer reviews, consumers have left negative reviews of this product complaining of receiving products that were expired, spoiled, moldy, and unsealed:

 Amazon Customer

★☆☆☆☆ **Product arrived open- Buyer Beware!!**
Reviewed in the United States on January 7, 2024
Verified Purchase

I wouldnt waste my money! When I opened the lid, this product was already open- the safety seal pushed in. Totally unsafe to take with an unsealed bottle like this. And of course, no returns or replacement allowed!!



---

 George Teng

★☆☆☆☆ **Beware!**
Reviewed in the United States on December 25, 2023
Verified Purchase

We received our first prenatal bottle thinking that it was normal. The first bottle appeared Normal so we did not think to question it. My wife was almost finished, when we noticed there was a difference in the appearance of the capsule. By then my wife has consumed an entire bottle of spoiled vitamins. We are worried about health of our future child



One person found this helpful

---

 Connell L.

★☆☆☆☆ **Item open**
Reviewed in the United States on October 17, 2023
Verified Purchase

My vitamins arrived open. The plastic outside plastic seal was on but the safety seal inside was ripped off. This was obviously opened and resealed.

One person found this helpful

---

 L

★☆☆☆☆ **Expired**
Reviewed in the United States on August 1, 2023
Verified Purchase

Just received these (Aug 1) and they expired in February.



One person found this helpful

[ Helpful ]  |  Report

---

 Alexis

★☆☆☆☆ **Contains mold - beware of this product**
Reviewed in the United States on February 23, 2024
Verified Purchase

The black specs found in the pill are NOT NORMAL- IT IS MOLD. I've been taking these pills for quite some time thinking the black specs were part of the vitamin, and today after speaking with a Thorne representative I found that the black specs are not normal. STOP TAKING THESE VITAMINS IF YOUR PILLS CONTAIN BLACK SPECS LIKE THE IMAGE ATTACHED.



One person found this helpful

[ Helpful ]  |  Report





61. The foregoing reviews are only a sample of the negative reviews of the products depicted above and of other Thorne products listed on Amazon that Defendants have sold through their Amazon Storefront. These reviews hurt Thorne's sales and goodwill because consumers around the world view and rely on these reviews, even when purchasing Thorne products offline. Even when the text of a review makes clear that the problem was seller-caused, it will lower the Thorne product's average review score and search placement.

62. Amazon does not allow product reviews to identify the seller who sold the product that is the subject of the product review. Given that Defendants have sold a high volume of products bearing the Thorne Trademarks on Amazon and are not subject to Thorne's quality controls, however, it is likely that some of the foregoing negative reviews—and the many other similar negative reviews of Thorne products that Defendants have sold on Amazon—were written by customers who purchased products bearing the Thorne Trademarks from Defendants.

**Thorne Has Implemented Quality Controls Throughout Its Authorized Channels of Distribution to Combat the Problems Cause by Online Marketplaces and Ensure Customers Receive the Genuine, High-Quality Products They Expect from Thorne**

63.    The above reviews show how sales of poor quality Thorne products disappoint Thorne's consumers and cause significant harm to the reputation and goodwill of Thorne and its brands.  To protect itself and consumers from these harms, Thorne implemented a quality control program that applies to all of its Authorized Sellers as well as to all products that Thorne itself sells to consumers.

64.    The goals of Thorne's quality control program are to minimize the likelihood that poor quality products reach consumers and ensure that consumers who purchase Thorne products, including consumers who buy online and those that purchase in a brick-and-mortar setting, receive the high quality products and services they expect from products sold under the Thorne family of brands.  By preventing consumers from receiving poor quality products, the program both protects consumers from confusion and also protects the value and goodwill associated with the Thorne Trademarks.

65.    Thorne's ability to exercise quality controls is particularly important for the products it sells because many Thorne products are ingested by consumers or applied to consumers' bodies and there may be health and safety risks associated with products that are expired or have not been properly inspected, stored, or handled.

66.    Thorne abides by its quality control requirements and requires its Authorized Sellers to abide by them as well.

67.    Thorne's ability to exercise its quality controls is essential to the integrity and quality of Thorne products, as well as the value of the Thorne Trademarks and other intellectual property.

**Authorized Sellers May Sell Thorne Products Only Through Specific Channels and Must Adhere to Thorne's Quality Control and Customer Service Requirements**

68.    Thorne maintains strict quality controls over Thorne products by allowing Thorne products to be purchased by end-user consumers only from Thorne itself or from Authorized Sellers.

69.    Most of Thorne's Authorized Sellers are physicians who sell Thorne products directly to their patients, including consultation services with those sales.

70.    Authorized Sellers are permitted to sell Thorne products only in approved channels and are required to abide by the Thorne Rules.  Thus, every Authorized Seller that sells Thorne products is subject to Thorne's quality control requirements.

71.    The Thorne Rules require Authorized Sellers to purchase Thorne products only from Thorne directly or from other Authorized Sellers, per the applicable policy.  This restriction ensures that the chain of custody can be established for all Thorne products sold to consumers by Authorized Sellers, and thus prevents unsafe or unsanitary products, secondhand goods, or other low quality products from entering into the distribution chain.

72.    The Thorne Rules also limit to whom and where Authorized Sellers may sell Thorne products.  To prevent persons outside of Thorne's quality controls from acquiring and reselling Thorne products, the Thorne Rules prohibit Authorized Sellers from selling Thorne products to any third party who is not an Authorized Seller and who intends to resell the products. Authorized Sellers are permitted to sell Thorne products only to end-user consumers or, in certain circumstances, to other Authorized Sellers.

73.    Given the many perils of unauthorized online sales as described above, Authorized Sellers are also prohibited from selling Thorne products on any website they do not themselves own and operate unless they first apply for and receive written approval from Thorne.

74.    These restrictions are essential to Thorne's ability to exercise its quality controls over Thorne products because they prevent unauthorized sellers from obtaining and reselling Thorne products and allow Thorne to know where all of its products are being sold online by Authorized Sellers.  If a quality issue arises through an online sale, Thorne can identify the Authorized Seller that made the sale, contact the Authorized Seller, and address the issue immediately.  Thorne is unable to take such action against unauthorized sellers because it does not know who those sellers are and cannot obtain their cooperation in addressing any product quality issues that may arise.

75.    In addition to restricting where and how Authorized Sellers can acquire and sell Thorne products, the Thorne Rules also require Authorized Sellers to follow numerous quality control requirements related to the inspection, storage, handling, and sale of Thorne products.

76.    To ensure that customers receive the genuine and high-quality products they expect from Thorne, the Thorne Rules require Authorized Sellers to inspect all products for any damage, defects, broken seals, evidence of tampering, and other non-conformances and remove all such products from their inventory.  Authorized Sellers are prohibited from selling damaged or defective products and are required to report any discovered defects to Thorne to assist it with identifying any product quality issues.

77.    Authorized Sellers must also regularly inspect their inventory for any products that are expired or within 90 days of expiration ("Not-Current Products"), not sell any Not-Current Products to consumers, and destroy or dispose of Non-Current Products in accordance with instructions provided by Thorne.

78.    The Thorne Rules also require that Authorized Sellers store Thorne products in a cool and dry environment, away from direct sunlight, extreme heat, and dampness, and in

accordance with other guidelines issued by Thorne.  These requirements help ensure that Thorne products are stored properly and are not damaged prior to being shipped to the consumer.

79.    To avoid consumer confusion and ensure that customers receive genuine Thorne products, Authorized Sellers must sell Thorne products in their original packaging and are prohibited from relabeling, repackaging, or altering Thorne products or any accompanying label, literature, or safety-related information without Thorne's consent.  Authorized Sellers are prohibited from reselling any products that have been returned opened or repackaged.

80.    Authorized Sellers must also cooperate with any product tracking utilized by Thorne and are prohibited from tampering with, defacing, or otherwise altering any identifying information on Thorne products, including any serial number, UPC code, or other identifying information.  Thorne uses QR codes on many of its products, and Authorized Sellers prohibited from altering or otherwise interfering with Thorne's QR codes.

81.    Authorized Sellers must also communicate all safety information to consumers and cooperate with Thorne with respect to any product recall or other consumer safety information dissemination effort conducted by Thorne regarding Thorne products.

82.    The Thorne Rules give Thorne the right to monitor and audit Authorized Sellers by inspecting their facilities and records relating to Thorne products, to ensure their compliance with Thorne's quality control requirements.  During any such investigation, Authorized Sellers must disclose information regarding their handling procedures and the identities of all their sources of Thorne products.

83.    The Thorne Rules also require Authorized Sellers to provide various customer services to their customers.  For example, Authorized Sellers must familiarize themselves with the features of all Thorne products kept in their inventory so they can advise customers on the selection

and safe use of Thorne products, offer ongoing support to consumers, and promptly respond to consumer inquiries before and after their sale of genuine Thorne products. Each Authorized Seller must also assist Thorne in investigating any customer complaint regarding a Thorne product sold by the Authorized Seller.

84.    Thorne's quality control and customer service requirements are legitimate and substantial and have been implemented so that Thorne can control the quality of goods manufactured and sold under the Thorne Trademarks, to protect consumers as well as the value and goodwill associated with the Thorne Trademarks.

85.    Thorne's quality control and customer service requirements are also material, as they are designed to protect consumers and prevent them from receiving poor quality and unsafe products. Consumers would find it material and relevant to their purchasing decision to know whether a Thorne product they were considering buying was being sold by an Authorized Seller who is subject to Thorne's quality control and customer service requirements or whether the product is being sold by an unauthorized seller who does not abide by Thorne's quality controls and over whom Thorne is unable to exercise its quality controls.

**Given the Flood of Poor Quality Products Sold Online and Consumers'
Inability to Inspect Such Products Before Purchase, Thorne Imposes
Additional Requirements on Its Authorized Sellers Who Sell Online**

86.    As shown in the consumer reviews cited above, *see supra* ¶¶ 56-61, Thorne products sold online are more susceptible to quality and authenticity problems because consumers cannot see products before buying them. These problems are especially severe on online

marketplaces such as Amazon, where sellers can conceal the fact that they are an unauthorized seller and many sellers may share a single product-listing page.

87.     Given the heightened risks to consumer satisfaction and the value of its trademarks that are posed by online sellers, Thorne imposes additional quality control requirements on all of its Authorized Sellers that sell Thorne products online.

88.     The Thorne Rules allow Authorized Sellers to sell Thorne products online to end-user consumers only through "Permissible Public Websites" and "Authorized Websites." These rules allow Thorne to oversee all Authorized Sellers that sell Thorne products online.

89.     A "Permissible Public Website" is a website that: (1) is operated by an Authorized Seller in the Authorized Seller's own legal name or registered fictitious name; and (2) lists the Authorized Seller's mailing address, telephone number, and email address. Only a portion of Thorne's Authorized Sellers are permitted to sell Thorne products on Permissible Public Websites; some Authorized Sellers are not permitted to do so even if they own and operate a website that meets the criteria of a Permissible Website.

90.     Authorized Sellers must receive written approval from Thorne before they can sell Thorne products on any website that does not meet the criteria of a Permissible Public Website. To obtain this approval, Authorized Sellers must submit applications in which they provide information about their business, identify all their sources of Thorne products, and list the specific websites where they wish to sell products. Applicants then undergo vetting by Thorne that includes review of their business operating business record and online review history. A website that Thorne permits an Authorized Seller to use through this process is called an "Authorized Website."

91.     Online marketplaces, including Amazon, do not qualify as "Permissible Public Websites" because they are operated by third parties rather than any Authorized Seller.

Accordingly, Authorized Sellers are prohibited from selling on any online marketplace, including Amazon, unless they are vetted by Thorne and specifically approved to sell on an online marketplace.

92.     The Thorne Rules impose numerous additional requirements on Authorized Sellers who sell Thorne products on Permissible Public Websites or Authorized Websites (collectively, "Authorized Online Sellers").

93.     For example, Authorized Online Sellers must use images of Thorne products that are provided or approved by Thorne and keep product descriptions up to date.  Authorized Online Sellers are also prohibited from advertising any Thorne product they do not carry in their inventory.

94.     The Thorne Rules prohibit Authorized Online Sellers from selling anonymously and instead require them to state their business name and current contact information on all websites where they sell, while not giving any appearance that the website is operated by Thorne or another third party.  These requirements allow consumers of Thorne products to understand the nature of the seller from whom they are purchasing and enable consumers to contact the seller if any quality issues arise.  These requirements also allow Thorne to protect the public from the sale of poor quality or counterfeit Thorne products because it allows for easy detection of any Authorized Online Seller that sells poor quality or counterfeit goods.

95.     Authorized Online Sellers who sell Thorne products on Authorized Websites may sell products only on the website(s) and under the name(s) specifically approved by Thorne.  At Thorne's request, Authorized Online Sellers must provide access to and copies of all web pages that make up any Permissible Public Website or Authorized Website where Authorized Online Sellers are selling Thorne products.

96.     Unless otherwise approved by Thorne, Authorized Online Sellers may not use any third-party fulfillment service to store inventory or fulfill orders for Thorne products.  Authorized Online Sellers are also prohibited from using any fulfillment service that could cause customers to receive Thorne products from other sellers' product stock when they purchase from Authorized Online Sellers.  These requirements ensure that the specific products that the Authorized Online Seller has that meet Thorne's quality standards will be those that are shipped to the customer in fulfillment of an order, rather than other products that are outside of Thorne's quality controls.

97.     All websites where Authorized Online Sellers sell Thorne products must have a mechanism for receiving customer feedback, and Authorized Online Sellers must take appropriate steps to address any feedback received.  Authorized Online Sellers must also: (i) keep copies of all information related to customer feedback regarding Authorized Online Sellers' products and their responses; (ii) provide this information to Thorne upon request; and (iii) cooperate with Thorne in investigating negative online reviews related to sales of Thorne products.

98.     The additional quality control requirements that Thorne imposes on its Authorized Online Sellers are legitimate and substantial and have been implemented to allow Thorne to carefully control the quality of Thorne products that are sold online and quickly address any quality issues that arise.

99.     Thorne's additional quality controls are also material, as they have been implemented to ensure that consumers purchasing Thorne products online receive genuine, high-quality Thorne products that abide by Thorne's quality controls.  Consumers purchasing Thorne products online would find it relevant to their purchasing decision to know whether a product they are buying is being sold by Thorne or by one of its Authorized Online Sellers that is subject to, and abides by, Thorne's quality controls.

### Thorne Monitors and Audits Its Authorized Online Sellers
### To Ensure They Comply With Its Quality Control Requirements

100.    Thorne regularly audits its Authorized Online Sellers to ensure they are adhering to its quality control requirements.  Thorne carries out its auditing and monitoring actions pursuant to an internal program called the Thorne Online Quality Control Program ("Auditing Program").

101.    As part of its Auditing Program, Thorne periodically examines a rotating sample of Permissible Public Websites and Authorized Websites to ensure that the Authorized Online Sellers who sell through the websites are complying with the Thorne Rules.  During these examinations, Thorne checks to make sure that, among other requirements, the websites: (i) clearly state an Authorized Online Seller's legal name or registered fictitious business name and provide contact information for the Authorized Online Seller; (ii) do not give the appearance that they are operated by Thorne or a third party; (iii) do not display any content that could be detrimental to Thorne and its brands; (iv) do not make any representations regarding Thorne products that are misleading; (v) exclusively contain images of Thorne products and product descriptions that are supplied or authorized by Thorne and up-to-date; and (vi) have a mechanism through which customers can provide feedback.

102.    Thorne also periodically inspects online reviews of Thorne products and Authorized Online Sellers that appear on Authorized Websites.  If Thorne discovers reviews asserting that Authorized Online Sellers provided poor customer service, sold poor quality Thorne products, or otherwise did not adhere to the quality control and customer service requirements that all Authorized Sellers are required to follow, Thorne communicates with the responsible Authorized Online Sellers to determine the cause(s) of the negative reviews, take any necessary corrective action, and secure the removal of negative reviews if possible.

103.    Thorne also periodically conducts a test purchase of a Thorne product from a rotating sample of Permissible Public Websites and Authorized Websites.  If Thorne discovers any quality problems in purchased products or discovers that an Authorized Online Seller is otherwise not following the quality control requirements that Authorized Online Sellers must follow when selling on Authorized Websites—for example, by altering product packaging or fulfilling product orders through an unapproved third-party fulfillment service— Thorne communicates with the responsible Authorized Online Seller and takes any necessary corrective action.

104.    If Thorne discovers that an Authorized Online Seller is selling Thorne products of poor quality or otherwise not adhering to Thorne's quality control or customer service requirements, Thorne may conduct an investigation to determine the source of the problem.  The Thorne Rules require that Authorized Online Sellers cooperate with Thorne's investigation, permit Thorne to inspect their facilities and records relating to Thorne products, and disclose all information about where they obtained Thorne products.  Based on what its investigation reveals, Thorne has the right to cease selling its products to an Authorized Online Seller and to suspend or terminate its status as an Authorized Seller of Thorne products.

**Genuine Thorne Products Come With Thorne's Satisfaction Guarantee;**
**Products Sold by Defendants Do Not**

105.    Thorne products purchased that are purchased by an end-user consumer from Thorne or an Authorized Seller also come with the Thorne 60-Day Satisfaction Guarantee (the "Satisfaction Guarantee").

106.    Under the Satisfaction Guarantee, a customer is able to receive from Thorne a product credit or a full refund of the purchase price of a Thorne product within 60 days of the original purchase date if the customer is not fully satisfied with their product.  The complete terms

of the Thorne Satisfaction Guarantee can be viewed at https://www.thorne.com/60-day-satisfaction-guarantee and are incorporated herein.

107.    Thorne extends the Thorne Satisfaction Guarantee only to products that were sold by sellers who are subject to Thorne's quality controls.  Because products sold by unauthorized sellers are not subject to Thorne's quality controls and Thorne cannot ensure the quality of such products, the Thorne Satisfaction Guarantee does not cover Thorne products sold by unauthorized sellers, including Defendants.  The Thorne Satisfaction Guarantee specifically states that "because we are unable to control the quality of our products sold by unauthorized sellers . . . the Thorne 60-Day Satisfaction Guarantee is not available for products purchased from unauthorized sellers, including unauthorized Internet sites."

### Defendants Are Not Authorized Sellers and Are Illegally Selling Non-Genuine Products Bearing the Thorne Trademarks

108.    Because the unauthorized sale of Thorne products on the Internet threatens the reputation and goodwill associated with the Thorne Trademarks, Thorne actively monitors the sale of its products online.

109.    In the course of this monitoring, Thorne discovered that high volumes of products bearing the Thorne Trademarks were being illegally sold on Amazon through a storefront called "River of Human Health," on Walmart through a storefront called "Oasis of Health_BlockChain," and on a private website called "Oasis of Health" located at https://theoasisofhealth.com.

110.    Through investigation, Thorne identified Reza, Parvin, Rez Candles, and PBD as the operators of the Amazon Storefront, Walmart Storefront, and Private Website and as the parties who are responsible for the unlawful sale of products bearing the Thorne Trademarks through the Amazon Storefront, Walmart Storefront, and Private Website.  Discovery may reveal that other

individuals and/or entities in addition to Reza, Parvin, Rez Candles, and PBD are also responsible for the conduct complained of herein.

111.    The Amazon Storefront lists Rez Candles as the "Business Name" of the operator of the storefront and Reza is the sole officer of Rez Candles.  The Walmart Storefront lists PBD Collectibles LLC as the "Business Name" of the operator of the storefront and Parvin is the sole member of PBD.  Reza has also held himself out as the owner of the Private Website on Reza's social media accounts.

112.    Reza has also held himself out as the owner of Rez Candles in Damascus, Maryland on Reza's social media accounts.

113.    Additionally, public records for Rez Candles identify the mailing address for Rez Candles as the same address that is listed on corporate documents as the registered agent address for PBD: 26212 Ridge Rd., Damascus, MD 20872 (the "Ridge Road Address").

114.    Through investigation, Thorne has determined that the Ridge Road Address is the brick-and-mortar store location for a business called "Oasis of Health," with a sign that says "Healthy Options and Supplements for both Human & Pet."  The Private Website that Defendants operate is also called "Oasis of Health."

115.    Upon information and belief, Parvin Davachi and Reza Davachi are related and Parvin is Reza's mother.  Defendants are acting in concert in a coordinated scheme to unlawfully sell products bearing Thorne's trademarks through multiple channels and are jointly responsible for the conduct complained of herein.

116.    Through investigation, Thorne has discovered that Defendants are "dropshipping" the products bearing Thorne Trademarks that they sell on the Internet, at least in part. "Dropshipping" is a method of selling products online where a seller lists products for sale that are

not in the seller's possession.  When customers make purchases, the seller purchases the products from other online sellers and has them shipped directly to their customer, acting as a middleman. When sellers "dropship" products, they never possess or see the products their customers receive and cannot vouch for the products' quality or authenticity.

117.    Among other indicia of dropshipping, Defendants sometimes fulfill product orders themselves, as opposed to using third parties for order fulfillment, but their customers often do not receive products that they purchase from Defendants until weeks—and often months—after the date of purchase.  As discussed in more detail below, Defendants sometimes attempt to conceal their dropshipping by promptly creating shipping labels at the time of purchase but then products are not actually shipped to customers until weeks or months after the shipping labels were created.

118.    Additionally, Defendants falsely claim to be an "FDA Registered Food Facility" on their Amazon Storefront.  However, the FDA publicly lists all registered establishments and owners, and neither River of Human Health, Oasis of Health, Rez Candles, PBD Collectibles, Reza Davachi, nor Parvin Davachi are registered with the FDA, according to a search by Thorne.

119.    On September 9, 2020, counsel for Thorne sent a cease-and-desist letter to Reza, Rez Candles, and PBD Collectibles by email and overnight mail.  The letter explained that Defendants are infringing the Thorne Trademarks by selling products that are materially different from genuine products sold by Thorne's Authorized Sellers and that are not subject to, do not abide by, and interfere with Thorne's quality controls.  The letter also explained that Defendants are tortiously interfering with Thorne's contracts by purchasing products from Authorized Sellers, who are prohibited from selling products to persons or entities who are not Authorized Sellers and resell the products.  The letter also informed Defendants that Thorne is located in South Carolina, is harmed in South Carolina as a result of Defendants' illegal sales of infringing products bearing

the Thorne Trademarks, and that Defendants will be subject to personal jurisdiction in South Carolina if they continued to engage in their illegal conduct and Thorne files suit. Thorne's letter demanded that Defendants permanently cease selling products bearing the Thorne Trademarks on Amazon and any other unauthorized website and disclose every person and entity that provided Defendants with the products they have sold.

120.    In the following years, Defendants periodically ceased listing and selling products bearing the Thorne Trademarks but then always resumed their sales. During this time, Thorne sent additional cease-and-desist letters to Defendants that repeated the demands in Thorne's September 9, 2020 letter. Thorne also sent a letter to Defendants that enclosed a draft complaint against Defendants that was prepared for filing in the United States District Court for the District of South Carolina.

121.    To date, Defendants have not responded to any of Thorne's cease-and-desist letters and are again actively advertising and selling products bearing the Thorne Trademarks through their Amazon Storefront, Walmart Storefront, and Private Website.

122.    Defendants' disregard of Thorne's cease-and-desist letters and continued sale of non-genuine products despite being informed of their unlawful conduct demonstrates that they are acting intentionally, willfully, and maliciously.

123.    Defendants have sold—and are continuing to sell—an extremely high volume of infringing products bearing the Thorne Trademarks. Monitoring software estimates that Defendants have sold more than 100,000 infringing products through their Amazon Storefront.

124.    Upon information and belief, through their Private Website and storefronts on the highly interactive Amazon and Walmart websites, Defendants accept and fulfill orders from South Carolina residents for products bearing the Thorne Trademarks and cause substantial quantities of

infringing products bearing the Thorne Trademarks to be shipped to persons located in South Carolina through the regular course of business.

125.    As of the time of filing, Defendants' Amazon Storefront is called "River of Human Health."  Amazon allows storefront operators to change the names of their storefronts, but every storefront on Amazon is assigned a "Merchant ID number" that does not change over time even if the formal "name" of a storefront is changed.  The Merchant ID number for Defendants' Amazon Storefront is A35CSG8GBUTFQU.  Even if Defendants change the name of their Amazon Storefront at some time in the future, their storefront can always be accessed at the following link that includes the storefront's Merchant ID number: https://www.amazon.com/sp?seller=A35CSG8GBUTFQU.

126.    As of the time of filing, Defendants' Walmart Storefront is called "Oasis of Health_BlockChain."  Walmart allows storefront operators to change the names of their storefronts, but every storefront on Walmart is assigned a Seller ID number that does not change over time even if the formal "name" of a storefront is changed.  The Seller ID number for Defendants' Walmart Storefront is 101007418.  Even if Defendants change the name of their Walmart Storefront at some time in the future, their storefront can always be accessed at the following link that includes the storefront's Merchant ID number: https://www.walmart.com/seller/101007418.

**Defendants Are Infringing the Thorne Trademarks by Selling Products Bearing the Thorne Trademarks That Are Not Subject to, Do Not Abide by, and Interfere With Thorne's Quality Control and Customer Service Requirements**

127.    Defendants are not Authorized Sellers of Thorne Products, are not subject to Thorne's quality controls, and do not comply with the Thorne Rules or the quality controls that Thorne imposes on its Authorized Sellers.

128.    Defendants, without authorization from Thorne, have sold—and continue to sell—products bearing the Thorne Trademarks through their Amazon Storefront, Walmart Storefront, and Private Website.  Defendants may also be selling products through additional channels that Thorne has not yet discovered and cannot discover until it is able to take discovery.

129.    Thorne has implemented quality control and customer service requirements throughout its authorized channels of distribution.  The products sold by Defendants are not genuine products because they are not subject to, do not abide by, and interfere with Thorne's quality control and customer service requirements that Authorized Sellers must follow.

130.    Thorne's quality control and customer service requirements are legitimate and substantial.  As a result of Defendants' sales of products that are not subject to, do not abide by, and interfere with these requirements, Thorne has lost control of the quality of goods that bear its trademarks.

131.    Defendants do not abide by Thorne's quality control requirements because they have not provided Thorne with their business information nor given Thorne an opportunity to vet them to determine if they meet Thorne's high standards for what it demands of its Authorized Sellers who sell Thorne products on Authorized Websites.  Instead, Defendants sell Thorne

products on Amazon, Walmart, and their Private Website without Thorne's authorization or oversight.

132.   Defendants do not comply with Thorne's quality control requirements—and interfere with Thorne's quality controls—because they have not disclosed to Thorne where they sell Thorne products online.  Defendants also do not provide customer feedback to Thorne that relates to their sales of products bearing the Thorne Trademarks or cooperate with Thorne in investigating negative online reviews relating to their sales of products bearing the Thorne Trademarks, as Authorized Online Sellers are required to do.  These actions prevent Thorne from being able to detect, address, and resolve any quality control issues or negative reviews that arise out of Defendants' sales of products bearing the Thorne Trademarks.

133.   Defendants also do not comply with Thorne's quality control requirements—and interfere with Thorne's quality controls—because they: (1) have not disclosed to Thorne where they acquire products that bear the Thorne Trademarks; (2) have not given Thorne the right to audit and inspect their facilities and records; and (3) dropship or use third-party fulfillment services when selling and shipping Thorne products to consumers.  As a result, among other things, Thorne cannot know if Defendants are: (i) sourcing products only from authorized sources; (ii) properly inspecting and storing products, and not selling poor quality products; (iii) selling products only in official and unaltered Thorne packaging; (iv) refusing to allow products that have been returned or repackaged to be listed as "new" products; (v) not permitting their products to be commingled with products owned by other sellers, such that a customer could receive a product owned by another seller when purchasing from Defendants; and (vi) providing exceptional customer service and responding appropriately to feedback received from customers.  The fact that Defendants are at least sometimes "dropshipping" the products bearing the Thorne Trademarks that they sell

means that Defendants do not even possess such products and have no knowledge of their origin or quality. Because Thorne has no ability to audit or oversee Defendants, Thorne also cannot obtain Defendants' assistance with any recall or consumer-safety information efforts that may arise related to any products they are selling or have sold in the past.

134. Defendants also do not comply with Thorne's customer service requirements, and provide poor customer service to customers, because they: (i) provide no or inaccurate contact information on their Storefronts and Private Website, (ii) do not offer ongoing support to consumers, and (iii) do not promptly respond to consumer inquiries before and after their sale of genuine Thorne products. Additionally, Thorne is not able to investigate any customer complaint regarding a Thorne product sold by Defendants.

135. Customers have written numerous reviews of Defendants' Amazon Storefront in which they complained of receiving products that were defective, melted, stuck together, old, damaged, in improper packaging, unsealed, broken, missing contents, or not authentic, as shown below:

> ★☆☆☆☆   "The vitamins were defective. All gooey & stuck together. The mfg date was over a yr old. The same #s as my old bottle so it must've been hanging around over a yr yet I had to wait 10 days for it to arrive. It came in a beat up envelope like it had travelled the world. I NEVER get it delivered like that only in a box. I had to reorder from Wal-Mart & wait another week. It came in a box. BAD EXP. "
> Read less
> By Candi on December 30, 2023.

> ★☆☆☆☆   "The outer seal was not present. It apparently had been removed before product was shipped. The inner seal didn't appear to be the original one. There was a broken capsule inside the bottle including the broken pieces of it. There was powder all over the remaining capsules. There were only 117 capsules (including the broken one) instead of the 120 that were supposed to be in there. Felt scammed! "
> Read less
> By G. on November 13, 2023.

> ★☆☆☆☆   "I don't think it's authentic product. Whole transaction was slow and sketchy. Won't buy from them again. "
> By Jay Michaels on September 28, 2023.

136.     Customers have also written numerous reviews of Defendants' Amazon Storefront complaining of extremely poor customer service, like never receiving products, not receiving refunds or returns, not being able to contact Defendants, and receiving fake tracking information and inaccurate shipping information, as shown below:[1]

| ★☆☆☆☆ | "Hello good evening, I want my money back because I never received the product." By Altair Alves de Barros on December 8, 2023. |

| ★☆☆☆☆ | "Please refund my purchase as I never received it." By Melody Parish on December 16, 2023. |

| ★☆☆☆☆ | "Ordered vitamins on October 27th, the seller shipped them with USPS. They said they dropped them off at my doorstep on December 4th. I have a gate at the front of the yard with a gate code, they did not leave them. Unscrupulous. I am calling my credit card company today to dispute this. I will never buy from this seller again, they do not accept returns and there is no way to contact them." Read less By kraigmont on December 5, 2023. |

| ★☆☆☆☆ | "I have not received my shipment by November 21, November 29. Please advise when it will be delivered or refund my account." By Amazon Customer on December 1, 2023. |

| ★☆☆☆☆ | "Package Never Arrived." By Michael P Hunsicker on November 15, 2023. |

| ★☆☆☆☆ | "It did not arrive" By jmr on December 15, 2023. |

| ★☆☆☆☆ | "this order was never received . it was last tracked to Damascus Maryland on September 6, 4:29 PM and nothing since I would like a refund or a reshipment of this product. Thank you for your time." Read less By Kristen King on October 3, 2023. |

[1] Many of the negative reviews on Defendants' Amazon Storefront are stricken through. As discussed more below, third-party sellers on Amazon are able to request that Amazon strike through negative reviews under certain circumstances. Defendants have improperly and deceptively asked Amazon to do so for many reviews.

 " I have received no product and no refund. "

By cynthia on September 18, 2023.

 " ~~This is the worst customer service I have ever seen! It has been a MONTH since I ordered this and still have not received the~~ ~~order! I will pass on to people to be aware of ordering ANYTHING from your company! Unbelieveable!!!!!~~ "

Read less

By arizonian on February 1, 2024.

**Message from Amazon:** The fulfillment issues associated with this order were not due to the seller

---

★☆☆☆☆    " ~~Poor customer service, poor shipping standards, DO NOT ORDER!~~ "

By Will Madison on January 23, 2024.

**Message from Amazon:** The fulfillment issues associated with this order were not due to the seller

---

★☆☆☆☆    " ~~Contacting the seller once he texted me it acted like an automated message. After that, he never responded to my messages,~~ ~~which were supposed to be answered within 48 hours. He produced a completely fake track number and did not give my~~ ~~order to the carrier. The most unprofessional seller I have experienced. should not be on this platform.~~ "

Read less

By BILAL O. on December 16, 2023.

**Message from Amazon:** The fulfillment issues associated with this order were not due to the seller

---

★☆☆☆☆    " ~~I still haven't received it and can't get in contact with anyone to get a refund~~ "

By Priscilla valenzuela on October 19, 2023.

**Message from Amazon:** The fulfillment issues associated with this order were not due to the seller

---

★☆☆☆☆    " ~~NO STARS Paid for product that was never sent. tried to contact seller to no avail. Amazon should drop this seller. Saw that~~ ~~other reviews have said same thing. They are rip-off artists.~~ "

Read less

By NORMAN L. JOHANSEN on September 26, 2023.

**Message from Amazon:** The fulfillment issues associated with this order were not due to the seller

---

★☆☆☆☆    " ~~After weeks of waiting and contacting the seller, I never got my package and theh didn't even offee to refund me. Awful~~ ~~customer service! BEWARE of ordering because if anything goes wrong with your order, you'll be on the phone with Amazon~~ ~~to try and get a refund because the company won't offer it even though it was literally weeks late with no shipping data!!!!!!~~ ~~Buyer beware!!!!!!!!!!!!!!!!!~~ "

Read less

By Honesty first! on September 10, 2023.

**Message from Amazon:** The fulfillment issues associated with this order were not due to the seller

137.    In response to many of these reviews, Defendants argue with their customers and provide poor service by making rude and sarcastic comments:

★☆☆☆☆ "These chocolate bars are stale. They are not past date but they must have gotten hot or something. They are gray colored and taste bad. They are not eligible for a refund."
Read less

By Cher on March 12, 2024.

"Thank you for not reaching out at all with the issue. We greatly appreciate it."
By River of Human Health on March 14, 2024.

---

★★★☆☆ "I cant believe i cannot return this, i just received it, it has not been opened, my family orders a ton of NOW products etc., we never returned anything."

By Amazon Customer on March 8, 2024.

"It is the customer's responsibility to READ AMAZON RETURN POLICIES before purchasing an item. Now it is the seller's fault when customer fail simple due diligence"
Read less

By River of Human Health on March 10, 2024.

---

★☆☆☆☆ "I ordered the super strength and received the incorrect product. Not the super strength"

By Bry Guy on February 29, 2024.

"Thanks for not contacting us at all except through this comment to give us a chance to rectify."
By River of Human Health on February 29, 2024.

---

★★☆☆☆ "Description says 2x 120 . Received only 1 bottle instead of 2."

By V. N. on February 3, 2024.

"You are being complete disingenuous if you honestly thought it was for 2 bottles. If you really thought this item was for 2 bottles the i would be questioning authenticity and not it was 2 bottles."
Read less

By River of Human Health on February 4, 2024.

---

★☆☆☆☆ "Received wrong product. Picture on order of Vitamin D3 is correct. Received Vitamin D3-5."

By Max on January 16, 2024.

"So you received MORE than what you ordered. What a travesty!!!!"
By River of Human Health on January 16, 2024.

---

★☆☆☆☆ "Received completely wrong item"

By Amazon Customer on January 2, 2024.

"So for 9.99 item you decided to leave a negative instead of contacting us to quickly rectify in your favor? Thanks and Happy new year to you."
By River of Human Health on January 3, 2024.

★☆☆☆☆ "Likely a fraudulent seller. Numerous cust. complaints of packages not received. Complained to Amazon cust. service, refund now being processed. Tracking # showed no new activity since Sept. 21st., says, "shipment received, package acceptance pending". Complained to post office and they say, "according to our tracking records your package was shipped by a third party and is not in USPS possession" "
Read less

By Nana on October 4, 2023.

"Ok. 3 days delayed in transit is just as you explained it. Fraudulent? Yup has to be the only explanation "
By River of Human Health on October 4, 2023.

138.    Amazon has stricken and added comments to many of the negative reviews of Defendants' Amazon Storefront, as shown above and below, stating that "[t]he fulfillment issues associated with this order were not due to the seller."  However, the issues and complaints that customers address in these reviews are clearly the fault of Defendants rather than a fulfillment problem, such as improper sales practices by Defendants and an inability to contact Defendants:

★☆☆☆☆ "I ordered these in January 31 it is March 6th I still have not received the 2 bottles a total of 107$. I am not able to make contact with the seller and Amazon has not been helpful. "
Read less

By Gale Fraley on March 6, 2024.

Message from Amazon: The fulfillment issues associated with this order were not due to the seller

★☆☆☆☆ "It has been 5 weeks and I still haven't received the product. I've tried contacting the seller and I haven't gotten refund either. Do not buy! "
By Carolyn Lasater on March 23, 2024.

Message from Amazon: The fulfillment issues associated with this order were not due to the seller

★☆☆☆☆ "ordered product. paid for product. never received product. could not track product because seller did not provide legitimate tracking number. "
By Kenneth W. Moore on December 17, 2023.

Message from Amazon: The fulfillment issues associated with this order were not due to the seller

139.    Defendants requested that Amazon strike through one review even though it has nothing to do with fulfillment.  That review states: "I hope Amazon investigates this seller.  River of Human Health is run by Rez Candles aka Reza Davachi.  Seems this is not the only scam they are running:   https://www.justice.gov/usao-wdmo/pr/three-men-charged-multi-million-dollar-software-piracy-scheme."  In the case discussed at that link, Reza and Rez Candles had previously pleaded guilty for participation in what a U.S. Attorney called "one of the largest software piracy

schemes ever prosecuted by the U.S. Department of Justice" (the "Conspiracy").  *Six Defendants Plead Guilty to $100 Million Software Piracy Scheme*, U.S. Dep't of Justice (Dec. 17, 2015), https://www.justice.gov/usao-wdmo/pr/six-defendants-plead-guilty-100-million-software-piracy-scheme.  Reza admitted that as a part of the Conspiracy, he paid Chinese counterfeiters hundreds of thousands of dollars for unauthorized and counterfeit software.  *Id.*  Reza also admitted to creating a fake charity organization for selling the counterfeit software on online marketplace website eBay.  *Id.*; *see also U.S. Davachi*, 4:15-cr-00346-DGK (W.D. Mo. 2015), transfer of jurisdiction, 8:18-cr-00561-PWG (D. Md. 2018).



140.    This is particularly evident because Defendants themselves ship to their customers many of the products they list for sale, or use a third-party fulfillment service or "dropship" the products.  As shown in the following sample screenshots, Defendants' listings of Thorne products on Amazon state that the products "Ship From" and are "Sold By" Defendants:





141.    Multiple consumers have left negative reviews warning others about Defendants'

deceptive practice of getting Amazon to improperly "strike" reviews where customers complained

of issues that were caused by Defendants, not Amazon:



> ⭐☆☆☆☆    "As of today September 9 , I have not received this product. Please It was ordered in July...."
>
> By What I received does not look like the product I ordered. The bottles, labels and color of gummies is completely different. Second time I ordered gummies that were completely different than product ordered. on September 10, 2023.
>
> **Message from Amazon: The fulfillment issues associated with this order were not due to the seller**

142. As reported in these reviews, Defendants are improperly asking Amazon to strike through negative reviews so that Defendants can attempt to avoid accountability for their abysmal customer service and sales of poor-quality products.

143. Additionally, upon information and belief, Defendants create shipping labels very soon after a customer purchases a product to make it appear as if the product has been shipped promptly from Defendants' location in Damascus, Maryland. In reality, as noted in the following sample reviews of Defendants' Amazon Storefront, products do not ship until weeks or months after a shipping label is created or never ship at all:

> ⭐☆☆☆☆    "Did NOT receive, post office showed item has NOT left vender physically! REFUND!!!!!!!!!!!!!!!!!"
>
> By Livingsweet on September 15, 2023.

> ⭐☆☆☆☆    "Ordered 7-31-23. Not yet received. Amazon: "contact buyer", buyer: "it is in transit". USPS on 8-8-23: "acceptance pending". I will not buy from this company again. Amazon should be more accessable or intercede somewhere. Purchased item many times before, from other sellers, never had an issue "acceptance pending". I am not a happy camper and this better not show up on my credit card statement. "
>
> Read less
>
> By Linda Rous on September 11, 2023.

> ⭐☆☆☆☆    "The label was created on 26th of February, still wasn't send yet "
>
> By Victor on March 21, 2024.
>
> **Message from Amazon: The fulfillment issues associated with this order were not due to the seller**

> ⭐☆☆☆☆    "This is the third time this has happened to me with this product. How can you say it's shipped and then it doesn't arrive at all? "
>
> By Amrita Sahasrabudhe on March 23, 2024.
>
> **Message from Amazon: The fulfillment issues associated with this order were not due to the seller**

> ★☆☆☆☆    "I have been waiting 6 weeks for my order. I am canceling and requesting a refund. What is the point of offering a product if you don't actually have the product in stock? This seller also says the manufacturer makes product to order. That cannot be true. It is BS."
> **Read less**
> By Amazon Customer on March 7, 2024.
> **Message from Amazon:** The fulfillment issues associated with this order were not due to the seller

> ★★☆☆☆    "Please advise why I still did not receive my order from 12/27/23. I contacted post office and they verified that seller did not initiate the shipment yet. Can you please review and expedite the shipment. Thank you."
> **Read less**
> By Irina Bindler on January 20, 2024.
> **Message from Amazon:** The fulfillment issues associated with this order were not due to the seller

> ★☆☆☆☆    "Terrible service. Placed order on October 29th, arriving November 24-29; here it is December 4th and according to USPS tracking they have not received it to ship!!"
> **Read less**
> By Sharon H. on December 4, 2023.
> **Message from Amazon:** The fulfillment issues associated with this order were not due to the seller

144.    Based on Thorne's investigation and the negative reviews about Defendants, it is clear that Defendants frequently list products for sale that are not in Defendants' possession at the time of listing or sale. When customers purchase products, Defendants create shipping labels to make it appear that they have already shipped products but then attempt to obtain the products via "dropshipping" them from other sellers, a practice that can take months and sometimes totally fails. While they engage in these deceptive tactics and mislead their customers, Defendants also ask Amazon to strike through negative reviews that complain of this practice to attempt to hide the truth from consumers.

145.    All of these reviews are only a sample of the negative reviews that customers have written about Defendants and their Amazon Storefront. Thorne allows its products to be sold only by itself and by Authorized Sellers who are subject to Thorne's quality controls to prevent customers from suffering the experiences like those described in the above complaints about Defendants.

146.    The negative reviews of Defendants' Amazon Storefront, along with negative customer reviews on Amazon of Thorne products that Defendants have sold, *see supra* ¶¶ 56-61, show that Defendants are very likely not carrying out the quality-control inspection, storage, handling, or customer service requirements that Thorne requires Authorized Sellers to follow for Thorne products.  Instead, Defendants are likely selling products bearing the Thorne Trademarks to consumers that are tampered with, unsealed, previously used, missing contents, damaged, dirty, foul-smelling, spoiled, melted, and expired rather than removing such products from their inventory.  These sales cause customers to write highly negative reviews of Thorne products that harm Thorne's reputation and hurt the placement of Thorne products in search results.

147.    Through their unauthorized use of the Thorne Trademarks, Defendants have misled—and continue to mislead—consumers into believing they are purchasing products with the same quality controls as genuine Thorne products.  In reality, however, the products sold by Defendants are materially different from genuine Thorne products—and are not genuine products—because they are not subject to, do not abide by, and interfere with Thorne's quality control and customer service requirements that Authorized Sellers must follow.

**Defendants Are Infringing the Thorne Trademarks by Selling Products Bearing the Thorne Trademarks That Do Not Come With the Thorne Satisfaction Guarantee**

148.    As set forth above, genuine Thorne products purchased from Thorne or an Authorized Seller come with the Thorne Satisfaction Guarantee.  However, Thorne does not provide the Thorne Satisfaction Guarantee for products purchased from non-Authorized Sellers because it cannot ensure the quality of products sold by sellers that are not subject to its quality controls.

149.    Because Defendants are not Authorized Sellers and are thus not subject to Thorne's quality control requirements, the products bearing the Thorne Trademarks that Defendants sell do not come with the Thorne Satisfaction Guarantee.

150.    Because the products Defendants sell do not come with the Thorne Satisfaction Guarantee, they are materially different from genuine Thorne products.

151.    The Thorne Satisfaction Guarantee is a material component of genuine Thorne products.  Consumers considering whether to purchase Thorne products would find it relevant to their purchasing decision to know whether the product they are purchasing is covered by the Thorne Satisfaction Guarantee.  Consumers who purchase products with the Thorne Satisfaction Guarantee receive the peace of mind that they are receiving a high quality product, that Thorne stands behind the product, and that they can get a refund or credit if they are not completely satisfied.

152.    Indeed, consumers on Thorne product listings on Amazon have complained of being unable to return products, showing that they were disappointed after purchasing products from unauthorized sellers that did not include the Thorne Satisfaction Guarantee.  An example is shown below:



153.    Defendants' unauthorized sale of non-genuine products bearing the Thorne Trademarks is likely to, and does, create customer confusion because customers who purchase

products from Defendants believe they are purchasing genuine Thorne products that come with the Thorne Guarantee when, in fact, they are not.

### Defendants Are Tortiously Interfering With
### Thorne's Agreements With Its Authorized Sellers

154.    As discussed, Thorne allows Thorne products to be sold to end-user consumers only by itself and by Authorized Sellers.

155.    Thorne has entered into agreements with all of its Authorized Sellers that prohibit Authorized Sellers from selling Thorne products to entities or persons who are not Authorized Sellers and who Authorized Sellers know, or reasonably should know, are going to resell the products.

156.    Defendants have sold and are continuing to sell a high volume of products bearing the Thorne Trademarks on the Internet.  Thorne has not itself sold any Thorne products to Defendants.  The only plausible way Defendants could be obtaining the volume of products they are reselling is by purchasing them from one or more Authorized Sellers.  Thus, upon information and belief, Defendants have purchased products from Authorized Sellers for the purpose of reselling them on the Internet.

157.    By purchasing products from Authorized Sellers and then reselling them on the Internet, Defendants caused and induced Authorized Sellers to breach their agreements with Thorne.

158.    Defendants have known that Thorne's contracts with its Authorized Sellers prohibit Authorized Sellers from selling products to non-Authorized Sellers, such as Defendants, whom the Authorized Sellers know or have reason to know are going to resell the products.

159.    Defendants have known of this prohibition since approximately September 9, 2020. On that date, Thorne emailed and overnight mailed a cease-and-desist letter to Defendants

49

explaining that Thorne has agreements with all of its Authorized Sellers that prohibit them from selling Thorne products to any person or entity that, like Defendants, is not an Authorized Seller but intends to resell the products. Thorne's letter also informed Defendants that: (i) by purchasing Thorne products from an Authorized Seller for the purpose of reselling them, they were causing a breach of the agreement between Thorne and its Authorized Seller and were interfering with Thorne's agreements and business relationships; and (ii) if Defendants continued to acquire products from Thorne's Authorized Sellers for the purpose of reselling them, they would be liable for tortiously interfering with Thorne's contracts and business relationships with its Authorized Sellers.

160.    Despite being provided this information, upon information and belief, Defendants have intentionally, knowingly, and willfully interfered with Thorne's agreements with its Authorized Sellers by inducing Authorized Sellers to breach their agreements and sell products to Defendants so that Defendants could unlawfully resell them.

161.    In interfering with Thorne's agreements, Defendants acted without justification and with a wrongful purpose. Defendants purchased Thorne products from Authorized Sellers—and in so doing, instigated a breach of Authorized Sellers' agreements with Thorne—so that Defendants could unlawfully infringe upon and materially damage the value of the Thorne Trademarks by reselling the products on the Internet, thereby committing an independent tort.

162.    Defendants are not parties to the agreements they caused Authorized Sellers to breach.

**Thorne Has Suffered Significant Harm as a Result of Defendants' Conduct**

163.    As set forth above, the unauthorized sale of products bearing the Thorne Trademarks by unauthorized sellers such as Defendants has caused significant harm to Thorne and its family of brands.

164. When a consumer receives a non-genuine, damaged, or poor-quality product bearing the Thorne Trademarks from an unauthorized seller, such as Defendants, the consumer associates that negative experience with Thorne. As such, Defendants' ongoing sale of non-genuine products bearing the Thorne Trademarks harms Thorne and its brands.

165. Thorne has suffered, and will continue to suffer, significant monetary harm as a result of Defendants' actions including, but not limited to, loss of sales, damage to its intellectual property, and damage to its existing and potential business relations.

166. Thorne has suffered, and will continue to suffer, irreparable harm as a result of Defendants' actions, including, but not limited to, irreparable harm to its reputation, goodwill, business and customer relationships, intellectual property rights, and brand integrity.

167. Thorne is entitled to injunctive relief because, unless enjoined by this Court, Defendants will continue to unlawfully sell non-genuine products bearing the Thorne Trademarks, causing continued irreparable harm to Thorne's reputation, goodwill, relationships, intellectual property, and brand integrity.

168. Additionally, Thorne is entitled to injunctive relief requiring Defendants to return or destroy infringing products because without that remedy, Defendants may evade injunctive relief by transferring their infringing products to another reseller.

169. Defendants' conduct was and is knowing, reckless, intentional, willful, malicious, wanton, and contrary to law.

170. Defendants' willful infringement of the Thorne Trademarks and continued pattern of misconduct demonstrate intent to harm Thorne.

## FIRST CAUSE OF ACTION
### Trademark Infringement
### 15 U.S.C. §§ 1114 and 1125(a)(1)(A)

171.    Thorne hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

172.    Thorne is the owner of the Thorne Trademarks.

173.    Thorne has registered the Thorne Trademarks with the United States Patent and Trademark Office.

174.    The Thorne Trademarks are valid and subsisting trademarks in full force and effect.

175.    Defendants willfully and knowingly used, and continue to use, the Thorne Trademarks in commerce for purposes of selling infringing products bearing the Thorne Trademarks on the Internet without Thorne's consent.

176.    The products Defendants sell bearing the Thorne Trademarks are not authorized for sale by Thorne.

177.    Defendants' use of the Thorne Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it falsely suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Thorne Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Thorne when they are not.

178.    Defendants' use of the Thorne Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine Thorne products.

179.    The products sold by Defendants are not, in fact, genuine Thorne products. The products sold by Defendants are materially different from genuine Thorne products because,

among other reasons, they are ineligible for the Thorne Satisfaction Guarantee and are not subject to, do not abide by, and interfere with Thorne's quality control requirements.

180.    Defendants' unauthorized use of the Thorne Trademarks has infringed upon and materially damaged the value of the Thorne Trademarks and caused significant damage to Thorne's business relationships.

181.    As a proximate result of Defendants' actions, Thorne has suffered, and will continue to suffer, immediate and irreparable harm.  Thorne has also suffered, and continues to suffer, damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

182.    Thorne is entitled to recover its damages caused by Defendants' infringement of the Thorne Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

183.    Thorne is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and, unless Defendants are permanently enjoined, Thorne will suffer irreparable harm.

184.    Thorne is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Thorne Trademarks, making this case exceptional.

### SECOND CAUSE OF ACTION
**Unfair Competition**
**15 U.S.C. § 1125(a)(1)(A)**

185.    Thorne hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

186.    As set forth above, Defendants are selling infringing products bearing the Thorne Trademarks that are materially different from genuine Thorne products.

187.    Defendants' sale of infringing products bearing the Thorne Trademarks is likely to cause consumer confusion and lead consumers to believe that those products are affiliated with, connected with, associated with, sponsored by, or approved by Thorne when they are not.

188.    Defendants' sale of non-genuine products bearing the Thorne Trademarks is likely to cause consumer confusion and lead consumers to believe that the products are genuine Thorne products when they are not.

189.    Defendant's conduct constitutes unfair competition under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

190.    Thorne is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' unfair competition and, unless Defendants are permanently enjoined, Thorne will suffer irreparable harm.

191.    Thorne is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith engaged in unfair competition, making this case exceptional.

## THIRD CAUSE OF ACTION
### Common Law Trademark Infringement

192.    Thorne hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

193.    Thorne is the owner of the Thorne Trademarks.

194.    Thorne has registered the Thorne Trademarks with the United States Patent and Trademark Office.

195.    The Thorne Trademarks are valid and subsisting trademarks in full force and effect.

196.    Defendants willfully and knowingly used, and continue to use, the Thorne Trademarks in commerce for purposes of selling infringing products bearing the Thorne Trademarks on the Internet without Thorne's consent.

197.    The products Defendants sell bearing the Thorne Trademarks are not authorized for sale by Thorne.

198.    Defendants' use of the Thorne Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive consumers because it falsely suggests that the products offered for sale by Defendants are the same as genuine products legitimately bearing the Thorne Trademarks and originate from, or are sponsored by, authorized by, or otherwise connected with Thorne when they are not.

199.    Defendants' use of the Thorne Trademarks in connection with their unauthorized sale of products is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine Thorne products.

200.    The products sold by Defendants are not, in fact, genuine Thorne products.  The products sold by Defendants are materially different from genuine Thorne products because, among other reasons, they are ineligible for the Thorne Satisfaction Guarantee and are not subject to, do not abide by, and interfere with Thorne's quality control requirements.

201.    Defendants' unauthorized use of the Thorne Trademarks has infringed upon and materially damaged the value of the Thorne Trademarks and caused significant damage to Thorne's business relationships.

202.    As a proximate result of Defendants' actions, Thorne has suffered, and continues to suffer, immediate and irreparable harm.  Thorne has also suffered, and continues to suffer,

damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

203.     Thorne is entitled to recover its damages caused by Defendants' infringement of the Thorne Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

204.     Thorne is also entitled to punitive damages because Defendants acted maliciously toward Thorne or in an intentional disregard of the rights of Thorne.

**FOURTH CAUSE OF ACTION**
**Unfair and Deceptive Trade Practices**
**S.C. Code §§ 39-5-10 *et seq*.**

205.     Thorne hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

206.     Thorne is the owner of the Thorne Trademarks.

207.     Thorne has registered the Thorne Trademarks with the United States Patent and Trademark Office.

208.     The Thorne Trademarks are valid and subsisting trademarks in full force and effect.

209.     Defendants willfully and knowingly used, and continue to use, the Thorne Trademarks in interstate commerce for the purpose of advertising, promoting, and selling infringing Thorne products on the Internet without the consent of Thorne.

210.     Defendants' unauthorized sale of products bearing the Thorne Trademarks interferes with Thorne's ability to exercise quality control over products bearing the Thorne Trademarks because Thorne is unable to audit Defendants to confirm they are complying with Thorne's quality control requirements and close their account if they fail to comply with Thorne's quality control requirements.

211.    The products Defendants sell are materially different from genuine Thorne products because they are not subject to, and interfere with, Thorne's quality controls.

212.    Defendants' use of the Thorne Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the Thorne Trademarks misrepresents the nature, characteristics, qualities, and origin of Defendants' products because it suggests that the products are subject to Thorne's quality control requirements when they are not.

213.    Defendants' use of the Thorne Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the Thorne Trademarks is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are genuine and authentic Thorne products when they are not.

214.    Defendants' use of the Thorne Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the Thorne Trademarks is likely to cause confusion, cause mistake, or deceive because it suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Thorne when they are not.

215.    Defendants' unauthorized and deceptive use of the Thorne Trademarks is material and likely to influence customers to purchase the products they sell, as consumers are likely to believe that products Defendants advertise using the Thorne Trademarks are genuine Thorne products that are subject to, and abide by, Thorne's quality control requirements and come with benefits associated with authentic Thorne products when they do not.

216.    Defendants' use of the Thorne Trademarks in connection with the unauthorized advertising, promotion, and sale of Thorne Products is an unfair and deceptive trade practice under the South Carolina Unfair Trade Practices Act ("SCUTPA"), S.C. Code. § 39-5-10 *et seq*.

217.    Defendants' use of the Thorne Trademarks in connection with the unauthorized advertising, promotion, and sale of Thorne Products has impacted, and will continue to impact, the public interest by deceiving customers into believing that the products Defendants offer for sale are genuine and authentic Thorne products when they are not and that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Thorne when they are not.

218.    As a result of Defendants' unlawful actions, Thorne has suffered, and continues to suffer, irreparable harm.  Thorne has also suffered, and continues to suffer, damages, including loss of business, goodwill, reputation, and profits, in an amount to be proven at trial.

219.    Thorne is entitled to damages, including punitive and treble damages, pursuant to S.C. Code § 39-5-140.

220.    Thorne is entitled to attorneys' fees and costs pursuant to S.C. Code § 39-5-140.

221.    Thorne is entitled to injunctive relief pursuant to S.C. Code § 39-5-50.

## FIFTH CAUSE OF ACTION
**Tortious Interference with Contract and Business Expectancy**

222.    Thorne hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

223.    Other than products that Thorne itself directly sells to consumers, Thorne products are sold to the public exclusively through Thorne's network of Authorized Sellers.

224.    Thorne has entered into valid and enforceable agreements with all of its Authorized Sellers.  These agreements specifically prohibit Authorized Sellers from selling Thorne Products to unauthorized resellers such as Defendants.

225.    Defendants are not Authorized Sellers of Thorne Products and Thorne itself has not sold any Thorne products to Defendants.  Despite these facts, Defendants have sold and are continuing to sell a high volume of products bearing the Thorne Trademarks on the Internet.  The

only plausible way Defendants could be obtaining the volume of products they are reselling is by purchasing them from one or more Authorized Sellers.

226.    Thus, upon information and belief, Defendants have purchased Thorne products from Authorized Sellers for the purpose of reselling them on the Internet.

227.    By purchasing products from Authorized Sellers and then reselling them on the Internet, Defendants caused and induced Authorized Sellers to breach their agreements with Thorne.

228.    Defendants have known that Thorne's contracts with its Authorized Sellers prohibit Authorized Sellers from selling products to non-Authorized Sellers, such as Defendants, who the Authorized Sellers know or have reason to know are going to resell the products.

229.    Defendants have known of this prohibition, among other reasons, because Thorne informed Defendants of this prohibition in a cease-and-desist letter it emailed and overnight mailed to Defendants on September 9, 2020.  Thorne has also advised Defendants of this prohibition in subsequent correspondence.

230.    Despite having knowledge of this prohibition, Defendants intentionally, knowingly, and willfully interfered with Thorne's agreements with its Authorized Sellers by continuing to induce Authorized Sellers to breach their agreements and sell products to Defendants that Defendants resold on the Internet.

231.    In interfering with Thorne's agreements, Defendants acted without justification and with a wrongful purpose.  Defendants purchased Thorne products from Authorized Sellers —and in so doing, instigated a breach of Authorized Sellers' agreements with Thorne —so that Defendants could unlawfully infringe upon and materially damage the value of the Thorne Trademarks by reselling the products on the Internet, thereby committing an independent tort.

Upon information and belief, Defendants also concealed and failed to disclose their intention to resell the products even after learning that this intention means Authorized Sellers are breaching their agreements with Thorne by selling to Defendants.

232.     Because Defendants have refused to disclose how they have obtained the products bearing the Thorne Trademarks they have resold, Thorne must take discovery in this action to learn the specific identities of the Authorized Sellers that sold products to Defendants.  Defendants, however, know the sources of the Thorne products they have obtained and are on notice of the basis for Thorne's claim of tortious interference.  Thorne's agreements with its Authorized Sellers are a specific class of contract that Defendants caused Authorized Sellers to breach when they purchased products from Authorized Sellers for resale.

233.     Defendants are not parties to the contracts they caused Authorized Sellers to breach.

234.     Defendants' actions have caused injury to Thorne for which Thorne is entitled to compensatory damages in an amount to be proven at trial.

235.     The injury to Thorne is immediate and irreparable, as Thorne's reputation and relationships have been damaged among its consumers and Authorized Sellers.

236.     Thorne is also entitled to recover punitive damages because Defendants acted maliciously toward Thorne or in an intentional disregard of the rights of Thorne.

## **PRAYER FOR RELIEF**

WHEREFORE, Thorne prays for relief and judgment as follows:

A.     Judgment in favor of Thorne and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble damages, restitution, including disgorgement of profits, punitive damages, and pre-judgment and post-judgment interest, as permitted by law;

B.     That a permanent injunction be issued enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

i)     Prohibiting the Enjoined Parties from distributing, circulating, selling, offering to sell, advertising, promoting, or displaying, via the Internet or otherwise, any Thorne products or products bearing the Thorne Trademarks;

ii)     Prohibiting the Enjoined Parties from using any of the Thorne Trademarks in any manner, including advertising on the Internet;

iii)     Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all products bearing any of the Thorne Trademarks;

iv)     Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any products sold by them which contain the Thorne Trademarks including invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and any other records that would reflect the source of the products that Defendants have sold bearing these trademarks;

v)     Requiring the Enjoined Parties to take all actions needed to remove Thorne's Trademarks, and any reference to Thorne Products, from any

61

website operated by or associated with the Enjoined Parties.  These required actions include but are not limited to removing all Thorne Products and Thorne Trademarks from any online marketplace storefront operated by or associated with the Enjoined Parties, including, but not limited to, the Amazon storefront with Merchant ID A35CSG8GBUTFQU and currently known as "River of Human Health," the Walmart storefront with Seller ID 101007418, and the private website located at www.theoasisofhealth.com, and requesting removal of any website operated by or associated with the Enjoined Parties and containing Thorne products or Thorne Trademarks from Internet search engines, including Amazon's product search and Google; and

vi)    Requiring the Enjoined Parties to destroy or return to Thorne all products bearing the Thorne Trademarks in their possession, custody, or control.

C.    An award of attorneys' fees, costs, and expenses; and

D.    Such other and further relief as the Court deems just, equitable and proper.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Thorne demands a trial by jury on all issues so triable.


Date: April 23, 2024

*/s/ Julie L. Moore*
Julie L. Moore (Fed. Bar No. 11138)
Robert Wehrman (Fed. Bar No. 13426)
DUFFY AND YOUNG, LLC
96 Broad Street
Charleston, South Carolina 29401
Telephone: (843) 720-2044
Facsimile: (843) 720-2047
jmoore@duffyandyoung.com

rwehrman@duffyandyoung.com

*Attorney for Plaintiff Thorne Research, Inc.*

Of counsel:

Daniel C.F. Wucherer
Vorys, Sater, Seymour and Pease LLP
301 E. 4th Street, Suite 3500
Cincinnati, OH 45202
Telephone: (513) 723-4093
Facsimile: (513) 723-4093
dcwucherer@vorys.com

Emma K. Morehart
Vorys, Sater, Seymour and Pease LLP
301 East Fourth Street, Suite 3500
Cincinnati, OH 45202
Telephone: (513) 723-4036
Facsimile: (513) 723-4036
ekmorehart@vorys.com

*Pro hac vice applications forthcoming*