## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| THORNE RESEARCH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:24-cv-02356-DCN |
| vs. | ) | |
| | ) | **ORDER** |
| REZA DAVACHI ("Reza"), REZ CANDLES INC., | ) | |
| PARVIN DAVACHI, PBD COLLECTIBLES | ) | |
| LLC, AND JONES DOES 1–10, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the court on defendants Reza Davachi ("Reza"), Rez Candles Inc. ("Rez Candles"), Parvin Davachi ("Parvin"), and PBD Collectibles LLC's ("PBD") (collectively, "defendants") motion to dismiss, ECF No. 12. Though captioned solely as a motion to dismiss, defendants request either that the court dismiss plaintiff Thorne Research Inc.'s ("Thorne") complaint pursuant to Rule 12(b)(6) or, in the alternative, strike the complaint and require Thorne to file an amended complaint pursuant to Rules 12(e) and 12(f). The court therefore reads this filing as two alternative motions. For the reasons set forth below, the court denies defendants' motion to dismiss and grants in part and denies in part defendants' motion to strike.

## I.   BACKGROUND[1]

This dispute arises from defendants' alleged misappropriation of Thorne's trademarks in connection with defendants' sale of products bearing Thorne's trademarks on the internet. ECF No. 1, Compl. Thorne is a health and technology company that

---

[1] The allegations in this section are presented in the light most favorable to Thorne. See Ostrzenski v. Seigel, 177 F.3d 245, 251 (4th Cir. 1999); Clark v. Milam, 152 F.R.D. 66, 71 (S.D.W. Va. 1993).

1

makes dietary supplements and at-home biomarker tests (the "Products"). Id. ¶ 18.

Thorne sells its Products to end-users either directly or through sellers Thorne has

expressly authorized to sell its products ("Authorized Sellers"). Id. ¶ 19. Thorne requires

its Authorized Sellers to abide by various quality control, customer service, and other

sales practices (the "Thorne Rules"). Id. ¶ 20. For instance, Authorized Sellers must

regularly inspect their inventory, must sell Thorne Products in their original packaging,

must destroy Products in their inventory that are past their expiration date, and must

communicate all safety and recall information to customers. Id. ¶¶ 68–85. Thorne also

imposes rules on how Authorized Sellers are to interact with customers. Id. ¶ 83. "For

example, Authorized Sellers must familiarize themselves with the features of all Thorne

products kept in their inventory so they can advise customers on the selection and safe

use of Thorne products, offer ongoing support to consumers, and promptly respond to

consumer inquires before and after their sale of genuine Thorne products." Id.

     When Authorized Sellers do business online, Thorne permits them to sell its

Products only on pre-approved authorized websites. Id. ¶¶ 86–99. Notably, Thorne will

only permit Authorized Sellers to sell Thorne Products on a website that the seller owns,

meaning Authorized Sellers are not permitted to sell Thorne Products on online

marketplaces, such as Amazon. Id. ¶¶ 90–91.

     Thorne prohibits Authorized Sellers from selling on online marketplaces, like

Amazon, in order to protect against customer confusion. Id. ¶¶ 38–49. Thorne

attributes customer confusion to the ways in which online platforms operate. Id. When a

customer goes to purchase a product on Amazon, he is directed to a single page listing

that product and the brand name. Id. ¶ 47. This causes the customer to believe he is

purchasing the product from the brand or from an Authorized Seller.  Id.  However, many sellers on Amazon, and other online sales platforms, are not Authorized Sellers.  Id.  As a result, when a customer receives a product that is damaged, he could be prone to blame the manufacturer for that damage rather than realizing that he purchased the product from an unauthorized seller.  Id. ¶¶ 46–49.  If the customer then voices that frustration through an online review of the product, the review could hurt the reputation of the brand because customers do not realize that they were not purchasing directly from the manufacturer.  Id. ¶¶ 49–51.

One of the other ways Thorne ensures quality control and good relationships with its customers is through Thorne's sixty-day satisfaction guarantee ("Satisfaction Guarantee").  Id. ¶ 105.  Under the Satisfaction Guarantee, Thorne will refund any customer's purchase price for a Product that customer purchased either from Thorne or from an Authorized Seller.  Id. ¶¶ 105–07.  Thorne's Satisfaction Guarantee is not available when customers purchase a Product from an unauthorized seller or on an unauthorized website, such as purchases through Amazon.  Id. ¶ 107.

To enforce the Thorne Rules, Thorne regularly inspects and audits Authorized Sellers.  Id. ¶ 82.  When an Authorized Seller is permitted to sell online, Thorne periodically examines the authorized websites to ensure they comply with Thorne's standards and reviews the customer feedback provided on those websites.  Id. ¶¶ 101–02.  Thorne will also conduct periodic "test purchases," in which it purchases Products online from Authorized Sellers to ensure that the Products comply with Thorne's quality control standards.  Id. ¶ 103–04.  Similarly, the only permissible websites for selling Thorne Products must include a mechanism for customer feedback.  Id. ¶ 97.  When customers

provide feedback online, Authorized Sellers are required to respond appropriately to the customer, keep copies of their interaction with the customer, and, if requested, report the interaction to Thorne and assist in Thorne's investigation of any negative online reviews. Id.  Additionally, Thorne requires its Authorized Sellers to purchase Products directly from Thorne and prohibits Authorized Sellers from selling Products to those who intend to resell the Products.  Id. ¶¶ 71–72.

Thorne accuses defendants of selling Thorne Products through unauthorized online storefronts and, in so doing, infringing on Thorne's trademarks.  Id. ¶¶ 108–126. Because defendants are not Authorized Sellers, and because Thorne has never sold products directly to defendants, Thorne suspects that defendants purchased their inventory from Authorized Sellers.  Id. ¶¶ 154–62.  This would mean that some Authorized Sellers violated their agreement with Thorne to not sell products to third parties for resale.  Id.

Additionally, Thorne believes that all defendants act in concert to operate various platforms, through which they engage in the unauthorized sale of Thorne Products.[2] Compl. ¶¶ 109–26.  In particular, defendants operate an online storefront on Amazon called "River of Human Health," an online storefront on Walmart.com called "Oasis of Health_BlockChain," and a private website called "Oasis of Health."  Id. ¶¶ 2, 109, 125– 26.  They also operate a brick-and-mortar store in Maryland called "Oasis of Health."  Id. ¶¶ 113–14.  Thorne believes defendants have sold at least 100,000 Products through

---

[2] Parvin is Reza's mother.  Compl. ¶ 115.  According to corporate filings, Reza is the sole corporate officer of Rez Candles, and Parvin is the sold member of PBD.  Id. ¶¶ 4–7, 11–13.  Thorne argues that Rez is the alter-ego of Rez Candles, and that Parvin is the alter-ego of PBD.  Id. ¶¶ 7, 13.

Amazon alone.  Id. ¶ 123.  Thorne contends that defendants' unauthorized sale of Products through their online storefront is likely to create customer confusion because it might lead customers to believe that they are purchasing products from Thorne or from an Authorized Seller.  Id. ¶ 147.

Customers have left negative reviews of Thorne Products on Amazon.  Id. ¶¶ 56–62, 135.  For instance, customers have complained of receiving rancid Products or Products that have been opened.  Id.  The Products receiving these negative reviews are the same types of Products sold by defendants on Amazon.  Id.  However, because it is not possible to associate a particular customer review with the customer's specific seller, it is not possible to know whether the reviews came from customers who purchased Products from defendants.  See id.  Nevertheless, given the volume of business defendants do on Amazon, and the fact that defendant's Products are not subject to Thorne's quality control rules, Thorne speculates that "it is likely that some of the foregoing negative reviews—and the many other similar negative reviews of Thorne products that Defendants have sold on Amazon—were written by customers who purchased products bearing the Thorne Trademarks from Defendants."  Id. ¶ 62.

Defendants have, in some instances, responded to negative customer reviews on Amazon.  Id. ¶137.  In these responses, defendants, have made sarcastic and rude comments to customers.[3]  Compl. ¶ 137.  One reviewer in particular stated that he hoped Amazon investigates River of Human Health.  Id. ¶ 139.  The reviewer stated: "River of Human Health is run by Rez Candles aka Reza Davachi.  Seems this is not the only scam

---

[3] It is not clear from the complaint if these interactions were responses to customers who purchased Thorne Products from defendants or if the customers purchased other products from defendants.  See Compl. ¶ 137.

5

they are running." Id.  The reviewer then provided a link to a United States Department of Justice ("DOJ") webpage describing a criminal case in which Reza and Rez Candles pleaded guilty to participation in a large software piracy scheme.  Id.

Many of the negative reviews on Amazon described fulfillment issues such as shipping delays, customers not receiving the products they ordered, or customers being given fake shipping or tracking information.  Id. ¶¶ 136, 138.   Thorne accuses defendants of "dropshipping."  Id. ¶ 144.  This practice involves listing Products for sale that are not in defendants' possession at the time.  Id.  Then, when a customer orders that Product, defendants attempt to obtain the Product from another seller.  Id.  This is risky, as defendants may not be able to immediately obtain the Product, resulting in long delays or their complete inability to fulfill the order.  Id.  To cover up their delays, defendants print shipping labels as soon as they receive an order, so that it looks as if they shipped the Product soon after the customer's order.  Id.  ¶ 143.  However, defendants often do not ship Products until weeks or months after the customer places the order.  Id.

Additionally, the Products sold on Amazon, whether by defendants or others, are not subject to Thorne's Satisfaction Guarantee, so many customers have expressed frustration when they were unable to return their defective Products.  See id. ¶¶ 58–62, 107, 129, 135–36.  Beyond that, because defendants are not Authorized Sellers, Thorne is unable to apply its normal quality control standards to the Products sold by defendants.  Id. ¶ 130–33.  This means that Thorne cannot know if the Products sold by defendants are up to Thorne's standards and cannot seek defendants' assistance in recalling defective Products.  Id. ¶ 133.

On April 23, 2024, Thorne filed a complaint and brought four claims: (1) trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114; (2) unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (3) common law trademark infringement; (4) violation of the South Carolina Unfair Trade Practices Act ("SCUPTA"), S.C Code § 39-5-10 et seq.; and (5) tortious interference with contract and business expectancy. ECF No. 1, Comp. ¶¶ 171–236. On June 18, 2024, defendants filed a motion to dismiss the complaint. ECF No. 12. Thorne responded in opposition on July 9, 2024, ECF No. 16, to which defendants replied on July 23, 2024, ECF No. 19. On October 1, 2024, Thorne field a notice of supplemental authority to alert the court of the United States District Court for the District of New Jersey's decision in Therabody, Inc. v. Dialectic Distribution LLC, 2024 WL 3355308 (D.N.J. July 10, 2024). ECF No. 25. As such, the motion is now fully briefed and ripe the court's review.

## II.  STANDARD

### A.  Rule 12(b)(6)

A Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted "challenges the legal sufficiency of a complaint." Francis v. Giacomelli, 588 F.3d 186, 192 (4th Cir. 2009) (citations omitted); see also Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992) ("A motion to dismiss under Rule 12(b)(6) does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."). To be legally sufficient, Rule 8 requires a complaint to contain: (1) "a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support"; (2) "a short and plain statement of the claim showing that the pleader is entitled to relief"; and (3) "a

demand for the relief sought, which may include relief in the alternative or different types of relief." Fed. R. Civ. P. 8(a). Moreover, under Rule 8(d), "[e]ach allegation must be simple, concise, and direct." Fed. R. Civ. P. 8(d)(1).

A Rule 12(b)(6) motion should not be granted unless it appears certain that the plaintiff can prove no set of facts that would support his claim and would entitle him to relief. Mylan Lab's, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). When considering a Rule 12(b)(6) motion, the court should accept all well-pleaded allegations as true and should view the complaint in a light most favorable to the plaintiff. Ostrzenski v. Seigel, 177 F.3d 245, 251 (4th Cir. 1999); Mylan Lab's, 7 F.3d at 1134. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

**B. Rule 12(e) and Rule 12(f)**

Pursuant to Federal Rule of Civil Procedure 12(e), "[a] party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). "Rule 12(e) must be read in connection with Rule 8, which sets the minimum pleading requirements." Doe v. Bayer Corp., 367 F. Supp. 2d 904, 917 (M.D.N.C. 2005).

8

Similarly, Rule 12(f) provides:

The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act:
> (1) on its own; or
> (2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading.

Fed. R. Civ. P. 12(f). Motions to strike "are generally viewed with disfavor because striking a portion of a pleading is a drastic remedy and because it is often sought by the movant simply as a dilatory tactic." Waste Mgmt. Holdings, Inc. v. Gilmore, 252 F.3d 316, 347 (4th Cir. 2001) (internal quotation marks and citations omitted); see also Brown v. Inst. For Fam. Centered Servs., Inc., 394 F. Supp. 2d 724, 727 (M.D.N.C. 2005) ("Motions to strike are . . . granted only for egregious violations."). When presented with a motion to strike, "the court must view the pleading under attack in a light most favorable to the pleader." Clark v. Milam, 152 F.R.D. 66, 71 (S.D.W. Va. 1993).

"[T]he decision of whether to strike all or part of a pleading rests within the sound discretion of the [c]ourt." Barnes v. District of Columbia, 289 F.R.D. 1, 6 (D.D.C. 2012) (citations omitted). "Rule 12(f) empowers courts to strike immaterial matter to promote judicial efficiency and avoid needless expenditure of time and money." Gibson v. Confie Ins. Grp. Holdings, Inc., 2017 WL 2936219, at *12 (D.S.C. July 10, 2017). "[S]uch motions are to be granted infrequently" and are reviewed for abuse of discretion: "decisions that are reasonable, that is, not arbitrary, will not be overturned." Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc., 227 F. App'x 239, 246–47 (4th Cir. 2007) (quoting Seay v. Tenn. Valley Auth., 339 F.3d 454, 480 (6th Cir. 2003)).

### III.  DISCUSSION

In general, defendants argue that Thorne's complaint is long, vague, and contains too many extraneous allegations not specifically related to defendants.  ECF No. 12.  As a result, they request that the court dismiss the complaint, or alternatively, strike the complaint and have Thorne redraft its pleadings.  Id.  Ultimately, the court finds that Thorne's complaint is sufficient to state a claim.  Additionally, while the court finds most of the complaint should not be stricken, the court will strike the allegations of paragraph 139, which relates to Reza's past criminal activity.  Accordingly, the court denies defendants' motion to dismiss and grants in part and denies in part their motion to strike.

The court will explain its reasoning in three parts.  First, it will examine the scope of defendants' motion and specifically whether they direct their motion at some or all of Thorne's causes of action.  Second, the court will examine whether Thorne has stated a claim or whether the complaint should be dismissed.  Finally, the court will examine whether Thorne's complaint should be stricken and/or redrafted.

#### A.  Scope of Defendants' Motion

Defendants ostensibly direct their motion at Thorne's entire complaint because they argue that all five causes of action suffer from the same fatal defect.  See ECF No. 12 at 5.  They argue that, to prevail on each of its claims, Thorne will have to demonstrate that defendants' sale of Thorne's Products constitutes trademark infringement.  Id.  Thus, in the body of their motion, defendants argue that Thorne has failed to allege its trademark infringement claims, and defendants argue in a footnote that Thorne's other claims (i.e., its SCUPTA and tortious interference claims) should similarly be dismissed because they are predicated on the same factual allegations.  Id. at

5–6 & n.4.  In response, Thorne argues that its SCUPTA and tortious interference claims are not based on the same factual allegations.  ECF No. 16 at 25–26.  In reply, defendants clarify their argument that Thorne's SCUPTA and tortious interference claims fail because Thorne's complaint lacks specificity.  ECF No. 19 at 7.

It is true that Thorne's first three causes of action—Lanham Act trademark infringement, Lanham Act unfair competition, and common law trademark infringement—all require demonstrating trademark infringement.  See Choice Hotels Int'l, Inc. v. Pfalzgraf Inv. Props. 02, LLC, 708 F. Supp. 3d 757, 767 (D.S.C. 2023) (explaining that the elements of Lanham Act unfair competition, South Carolina common law trademark infringement, and Lanham Act trademark infringement are all essentially the same).  Similarly, it is possible to base a SCUPTA claim on trademark infringement, Upstate Plumbing, Inc. v. AAA Upstate Plumbing of Greenville, LLC, 2018 WL 1471908, at *6 (D.S.C. Mar. 26, 2018), and in such instances, "[t]he standard for liability for trademark infringement under [SCUTPA], like that of the Lanham Act, is likelihood of consumer confusion," Johnson v. Sonsebee, 397 F. Supp. 2d 706, 712 (D.S.C. 2005).  The court agrees with defendants that Thorne's allegations in support of its SCUPTA claim are predicated on trademark infringement.  See Compl. ¶¶ 205–21.  Therefore, the court finds that defendants' motion encompasses Thorne's SCUPTA claim.

On the other hand, the court agrees with Thorne that its tortious interference claim is not necessarily based on allegations of trademark infringement.[4]  Thorne bases its

---

[4] To succeed on a claim for tortious interference with contractual relations under South Carolina law, a plaintiff must prove "1) the existence of a contract; 2) knowledge of the contract; 3) intentional procurement of its breach; 4) the absence of justification; and 5) resulting damages."  Eldeco, Inc. v. Charleston Cnty. Sch. Dist., 642 S.E.2d 726, 731 (S.C. 2007).  The court is not aware of any South Carolina caselaw recognizing

tortious interference claim on defendants' alleged purchase of the Thorne Products from Authorized Sellers for resale. <u>See</u> Compl. ¶¶ 222–36. Thorne's contracts with its Authorized Sellers allegedly prohibits the Authorized Sellers from selling Thorne Products to third parties for unauthorized resale. <u>Id.</u> Thus, Thorne contends that defendants tortiously interfered with its contractual relationship with its Authorized Sellers. <u>See id.</u> Defendants have not argued how trademark infringement is a requirement for Thorne to succeed on this claim, and the court finds that this cause of action is based on separate factual allegations. Consequently, because defendants fail to specify why Thorne's allegations are insufficient to plead a tortious interference claim, the court reads defendants' motion as being directly exclusively at Thorne's first four causes of action and denies the motion to the extent, if at all, that it is directed at Thorne's tortious interference claim.

### B. Motion to Dismiss

To establish trademark infringement, Thorne must demonstrate "(1) that it owns a valid mark; (2) that the defendant[s] used the mark 'in commerce' and without [Thorne's] authorization; (3) that the defendant[s] used the mark (or an imitation of it) 'in connection with the sale, offering for sale, distribution, or advertising' of goods or services; and (4) that the defendant[s'] use of the mark is likely to confuse consumers." <u>Rosetta Stone Ltd. v. Google, Inc.</u>, 676 F.3d 144, 152 (4th Cir. 2012). "As a general rule, trademark law does not apply to the sale of genuine goods bearing a true mark, even if the sale is without the mark owner's consent." <u>Shell Oil Co. v. Com. Petroleum, Inc.</u>, 928 F.2d 104,

---

"tortious interference with business expectancy" as a cause of action, so the court reads Thorne's complaint as exclusively advancing a tortious interference with contractual relations claim.

107 (4th Cir. 1991). "Under what has sometimes been called the 'first sale' or 'exhaustion' doctrine, the trademark protections of the Lanham Act are exhausted after the trademark owner's first authorized sale of that product." Davidoff & CIE, S.A. v. PLD Int'l Corp., 263 F.3d 1297, 1301 (11th Cir. 2001). In other words, the first sale doctrine "permits the resale of trademarked goods without subjecting the reseller to infringement liability where there is no possibility that the subsequent purchaser will confuse the reseller for the producer." Sprint Nextel Corp. v. Simple Cell, Inc., 2013 WL 3776933, at *7 (D. Md. July 17, 2013). Courts recognize various exceptions to the first sale doctrine, which typically arise in instances when the resold product could not be considered "genuine." See Enesco Corp. v. Price/Costco Inc., 146 F.3d 1083, 1085–87 (9th Cir. 1998); 169 Am. Jur. Trials 227 §§ 12–16, Westlaw (database updated October 2024).

Defendants argue that Thorne's allegations fail because they lack specificity. ECF No. 12 at 6. Defendants contend that Thorne has failed to allege (1) any specific sales by defendants to a particular customer, (2) that defendants' products are counterfeit or not first sold by Thorne, (3) that defendants did not lawfully purchase Thorne products for resale, or (4) a contractual or direct relationship between defendants and Thorne. ECF No. 12 at 6. Instead, defendants characterize Thorne's complaint as alleging only that defendants sold Thorne products without Thorne's consent, and this, they argue, is not enough to establish liability because of the first sale doctrine. Id. at 6–8. In response, Thorne argues that its allegations are sufficient to state a claim for trademark infringement under the quality control and material difference exceptions to the first sale doctrine. See ECF No. 16 at 11–25. The court will take each of these concepts in turn.

13

### 1. Quality Control Exception

The quality control exception recognizes that "[d]istribution of a product that does not meet the trademark holder's quality control standards may result in the devaluation of the mark by tarnishing its image. If so, the non-conforming product is deemed for Lanham Act purposes not to be the genuine product of the holder, and its distribution constitutes trademark infringement." Warner-Lambert Co. v. Northside Dev. Corp., 86 F.3d 3, 6 (2d Cir. 1996). In Shell Oil, the Fourth Circuit determined that a wholesaler was liable to a motor oil manufacturer for trademark infringement when the wholesaler sold motor oil bearing the manufacturer's mark but not subject to the manufacturer's quality control standards. 928 F.2d at 107–08. The court explained that this constituted trademark infringement because (1) "[a] product is not truly 'genuine' unless it is manufactured and distributed under quality controls established by the manufacturer," and (2) customers were likely to be confused when they were sold oil bearing the manufacturer's mark but without the manufacturer's quality control procedures. Id. In Warner-Lambert, the Second Circuit established a three-part test to determine when a trademark holder is entitled to relief under the quality control exception: "The trademark holder must demonstrate only that: (i) it has established legitimate, substantial, and nonpretextual quality control procedures, (ii) it abides by these procedures, and (iii) the non-conforming sales will diminish the value of the mark." 86 F.3d at 6.

Defendants argue that Thorne's allegations are insufficient to establish the quality control exception because the alleged quality control failures are not related to the quality of the product itself. ECF No. 12 at 8–10. Instead, defendants contend that Thorne

alleged only that they did not meet its quality control standards by not reporting information to Thorne and that this is unlikely to create customer confusion.  Id.

In response, Thorne argues that it has alleged sufficient facts to demonstrate each element of the Warner-Lambert test.[5]   ECF No. 16 at 16 & n.8.

> First, Thorne has implemented extensive quality controls throughout its authorized channels of distribution.  Second, Thorne follows its quality controls and requires all Authorized Sellers to follow the quality controls. Finally, Defendants' sales of products are outside of Thorne's quality controls and diminish the value of the Thorne Trademarks because, inter alia, their sales result in consumers receiving poor-quality products and cause consumers to write negative online reviews of Thorne Products that blame Thorne and cause other consumers to be less likely to purchase Thorne Products.

Id. at 16–17 (citations omitted).  Thorne also contends that, despite defendants' arguments, Thorne did allege quality control standards relating to the products that defendants do not follow.  Id. at 17–18 (citing Compl. ¶¶ 28–99, 131–44).  These include measures to prevent sellers from defacing information on the products and communicate safety information to customers.  Id. at 17.  Moreover, Thorne argues that, for purposes of the quality control exception, "[t]he actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain."  Id. at 18 (quoting Shell Oil, 928 F.2d at 107).  Therefore, Thorne is not required to allege that defendants actually sold a product of poor quality to state a claim.  Id. at 18–19.  Instead, Thorne contends that it is enough for it to allege that defendants interfered with its quality control measures.  Id. at 19.

---

[5] Thorne concedes that the Fourth Circuit has never adopted the Warner-Lambert test but argues that this test "has been widely accepted and adopted in courts across the country."  ECF No. 16 at 16 n.8.

Though its allegations could have been clearer, the court finds that Thorne has sufficiently alleged trademark infringement under the quality control exception. Thorne's complaint explains the measures Thorne undertakes to ensure the quality of its products, such as ensuring that Authorized Sellers dispose of rancid or expired Products and not defacing Product labels. Compl. ¶¶ 20, 65–85. Thorne has also alleged that defendants engaged in the unauthorized sale of Products without these same quality control measures. Id. ¶¶ 130–33. While it may be true that Thorne did not specifically allege a sale of a poor-quality product to a specific customer, Thorne has alleged that defendants engaged in at least 100,000 unauthorized sales and that, because the sales were unauthorized by Thorne, they did not comply with the Thorne Rules. Id. ¶¶ 123, 130–33. Moreover, even if Thorne did not allege defendants sold poor quality goods, the Fourth Circuit has explained, "the actual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain." Shell Oil, 928 F.2d at 107 (alteration omitted) (quoting El Greco Leather Prods. Co. v. Shoe World, 806 F.2d 392, 395 (2d. Cir. 1986), cert. denied, 484 U.S. 817 (1987)).

Similarly, Thorne has also alleged that defendants' sale of the Products through online storefronts is likely to cause customer confusion because customers might believe they are purchasing the Product directly from Thorne. Compl. ¶¶ 130–33, 147. Even if defendants are correct that Thorne has not alleged that any of these failures confused customers, Thorne is only required to plead that confusion is likely. See Shell Oil, 928 F.2d at 108. Consequently, Thorne's allegations are sufficient to state a claim for trademark infringement under the quality control exception.

16

## 2. Material Difference Exception

When someone sells a materially different product with the manufacture's mark, that action can constitute trademark infringement because it might confuse customers and erode consumer goodwill toward the mark. Davidoff, 293 F.3d at 1302; Sprint Nextel, 2013 WL 3776933, at *8 ("The first sale doctrine does not apply when an alleged infringer sells trademarked goods that are materially different than those sold by the trademark owner." (alteration omitted) (quoting TracFone Wireless Inc. v. Pak China Grp. Co., 843 F. Supp. 2d 1284, 1296–94 (S.D. Fla. 2012)). "A material difference is one that consumers consider relevant to a decision about whether to purchase a product." Davidoff, 293 F.3d at 1302. For example, the United States District Court for the District of Maryland has held that a mobile phone manufacturer adequately pled a trademark infringement claim against defendants who were selling phones without the "services, warranties, and terms" that were included when the manufacturer or an authorized seller sold the phone. Sprint Nextel, 2013 WL 3776933, at *8. The court reasoned that the defendants' sale of the phone manufacture's products with the manufacturer's trademark could plausibly confuse customers on the relationship between the sellers and the manufacturer. Id.

Defendants argue that Thorne's allegations are insufficient to establish the material difference exception because the purported material differences—the lack of Thorne's Satisfaction Guarantee and customer service—are both known to the customer. ECF No. 12 at 10–12. In support of this argument, defendants note that, on the screenshots from Amazon that Thorne cites in its complaint, it is clear to the customer that the product is "Sold by [defendants]" and "Non-returnable." Id. at 11. Defendants

17

also provide a link to Amazon's return information and policies, which indicates that manufacturers warranties may not apply to all sales. Id. Consequently, defendants argue that Thorne has not alleged, and cannot allege, that any customers were confused over the origin of the Products. Id. at 12.

In response, Thorne argues that courts have held that the absence of a manufacturer's Satisfaction Guarantee or warranty can count as a material difference. ECF No. 16 at 21–22. Thorne contends that its allegations are sufficient to plead the material difference exception because Thorne has alleged that the defendants' products do not come with Thorne's Satisfaction Guarantee, which is an important and material benefit to customers. ECF No. 16 at 22 (citing Compl. ¶¶ 105–07, 148–53). Thorne claims that defendants do not dispute that their products are materially different and instead argue that there is no likelihood of customer confusion, but this does not change the analysis. ECF No. 16 at 22. First, Thorne points to its allegations that "customers still expect to receive the same benefits when they purchase products from sellers on Amazon that they would receive from Thorne's Authorized Sellers, and have no way of knowing that Defendants are not Authorized Sellers." ECF No. 16 at 22 (citing Compl. ¶¶ 37–40, 46–49, 153, 177–78, 187–88, 198–99). "Second, whether the statement 'non-returnable due to food safety reasons' dispels confusion about whether Thorne would provide its Satisfaction Guarantee for the purchase is a classic question of fact that cannot be resolved at the motion-to-dismiss stage." ECF No. 16 at 23.

The court finds that Thorne has plausibly pled that defendants' alleged practice of selling Products without Thorne's Satisfaction Guarantee or subject to Thorne's quality control standards plausibly could confuse consumers. Compl. ¶ 147. This is all that is

18

required to survive a motion to dismiss.  See Sprint Nextel, 2013 WL 3776933, at *8.

Therefore, the court finds that Thorne's allegations are sufficient to plead the material

difference exception.

As such, the court finds that Thorne's allegations are sufficient to state a claim for

trademark infringement, and the court denies defendants' motion to dismiss.  The court

now moves to the question whether it should strike Thorne's complaint.

### C.  Motion to Strike

Defendants argue that the court should strike Thorne's complaint and direct

Thorne to file an amended complaint under either Rule 12(e) or Rule 12(f).  ECF No. 12

at 12–16.  Defendants contend that they are having trouble responding to Thorne's

complaint because it is so long and includes only a few allegations directed at defendants,

which are "[b]uried within a morass of irrelevant and unrelated allegations."  Id. at 13.

Defendants argue that the majority of Thorne's allegations have nothing to do with

defendants and that defendants, therefore, do not have personal knowledge or information

concerning these allegations.  ECF No. 12 at 13–14.  They go on to point to several of

Thorne's allegations that they claim are redundant or immaterial.  Id. at 13–15.  Finally,

defendants point specifically to paragraph 139 in Thorne's complaint, which they say

"sets forth a scandalous allegation concerning an unrelated criminal matter against one of

the Defendants, which is immaterial to the claims alleged."  ECF No. 12 at 15.

In response, Thorne argues that its complaint is sufficient because it clearly

identifies defendants, their actions, and how they are related and contains the necessary

legal and factual claims.  ECF No. 16 at 27.  Thorne further contends that its detailed

factual allegations were necessary for it to properly plead its claims under Fourth Circuit

precedent.  Id. at 28.  Ultimately, Thorne argues that defendants were put on notice of the claims against them by the complaint.  Id.  Finally, Thorne acknowledges that paragraph 139 references a prior criminal matter of one of the defendants, but Thorne argues that this is relevant because a customer discussed this matter in an Amazon review, and the allegation shows that defendants are harming Thorne's reputation.  ECF No. 16 at 28 n.15.

In reply, defendants emphasize that most of Thorne's allegations have nothing to do with them and that Thorne has not alleged a specific instance in which any defendant sold a Thorne product.  ECF No. 19 at 3–7.  They therefore argue that Thorne's allegations are conclusory and inadequate.  Id.  Defendants also argue that Thorne has failed to tie any of the alleged violations of Thorne's quality control standards to defendants.  Id. at 7–9.  Without these specificities, defendants argue that they cannot adequately respond to Thorne's complaint.  Id.

To reiterate, the court agrees with defendants that Thorne's complaint is too long and could certainly afford to be more concise.  However, the court does not believe that most of the extraneous allegations in the complaint constitute the sort of "egregious violation[ ]" requiring that the court strike the pleading.  See Brown, 394 F. Supp. 2d at 727.  Rather, the court finds that the complaint is clear enough to put defendants on notice of the allegations, such that they should know how to defend themselves.  See Dillard, 2019 WL 1244701, at *2.

That said, the court agrees with defendants that the allegation in paragraph 139 should be stricken.  In this paragraph, Thorne alleges that a customer wrote a review on Amazon in which the customer complained about customer service he received from

20

"River of Human Health" and provided a link to a DOJ webpage describing Reza pleading guilty to a high-profile computer software piracy scheme.  Compl. ¶ 139.  The allegation then goes on to detail Reza's crime and guilty plea.  Id.

Rule 12(f) permits the court to strike "scandalous" allegations.  Fed. R. Civ. P. 12(f).  "'Scandalous' includes allegations that cast a cruelly derogatory light on a party to other persons.  The granting of a motion to strike scandalous matter is aimed, in part, at avoiding prejudice to a party by preventing a jury from seeing the offensive matter or giving the allegations any other unnecessary notoriety inasmuch as, once filed, pleadings generally are public documents and become generally available."  CTH 1 Caregivers v. Owens, 2012 WL 2572044, at *5 (D.S.C. July 2, 2012) (internal quotation marks and citations omitted).

It is not apparent from paragraph 139 that the customer tied those crimes to Thorne.  See Compl. ¶ 139.  Indeed, it is not even clear if the customer was reviewing a Thorne product when he included this information.  See id.  Beyond that, this customer's review clearly indicates that the customer is aware that he is purchasing a product from Reza.  See id.  Consequently, the court does not agree with Thorne's argument that this allegation shows that its reputation is being hurt by Reza's previous criminal schemes.  If anything, the allegation indicates that the customer was complaining specifically about Amazon working with Reza, not Thorne.  See id.  This would seem to suggest that the customer was not attributing Reza's criminal behavior to Thorne.  See id.  As such, the court grants defendants' motion to strike paragraph 139 but denies it in all other respects.

21

## IV.   CONCLUSION

For the foregoing reasons, the court **DENIES** defendants' motion to dismiss and

**GRANTS IN PART** and **DENIES IN PART** defendants' motion to strike.

**AND IT IS SO ORDERED.**

_____

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**October 29, 2024**
**Charleston, South Carolina**